563 So.2d 233 (1990)
James Fenton TABOR and His Wife, Mary Florence Tabor
v.
DOCTORS MEMORIAL HOSPITAL, HCA Health Services of Louisiana, Inc. d/b/a Doctors Memorial Hospital, Dr. John Dunn, and Emergency Physicians Association.
No. 90-C-0119.
Supreme Court of Louisiana.
June 4, 1990.
*234 Edward J. Walters, Jr., Moore, Walters & Shoenfelt, Baton Rouge, for James F. Tabor and Mary F. Tabor, plaintiffs-applicants.
W. Luther Wilson, Baton Rouge for Dr. John D. Dunn and Emergency Physicians Ass'n Inc., defendant-respondent.
Donald S. Zuber, Seale, Smith, Zuber & Barnette, Baton Rouge, for HCA Health Services of La. Inc. d/b/a Doctor's Memorial Hosp., defendant-respondent.
*235 MARCUS, Justice[*].
James and Mary Tabor brought this medical malpractice action for the wrongful death of their son, Andy.
On Friday, July 3, 1981 at approximately 5:00 P.M., plaintiffs returned to their Baton Rouge home after a business trip. As they pulled into the apartment complex where they lived, they saw their youngest son, Andy, then twenty-two years old. He was staggering and his speech was slurred. Andy told his parents that he was going back to his apartment to sleep. He lived with his brother, Sam, in an apartment just around the corner from his parents. The next contact plaintiffs had with Andy was at 11:30 that same night. They received a call from Sam and immediately went over to their sons' apartment. Andy was groggy and incoherent, and his lips were swollen and purplish. He said he had taken thirteen quaaludes.[1] After unsuccessful attempts to rouse Andy and to induce vomiting, plaintiffs, Sam, and Sam's girlfriend took Andy to the emergency room at Doctors Memorial Hospital.
Dr. John D. Dunn and three nursing personnel staffed the emergency room that night. Dr. Dunn was employed by Emergency Physicians Association, Inc. which contracted with the hospital to provide physician coverage in the emergency room. Dr. Dunn examined Andy, ordered a bilirubin test[2], and collected background information from the family. Dr. Dunn was told that Andy had been depressed recently and was being treated for depression on an out-patient basis by Dr. Lautner, the Tabors' family physician. The family focused on three events as the bases for Andy's depression. His girlfriend broke up with him three weeks earlier. His maternal grandfather, to whom Andy was close, died on June 1 after a protracted illness. In addition, Andy's father was still recovering from a brain aneurysm for which he underwent neurosurgery in March. Based on the physical exam and the history, Dr. Dunn diagnosed ingestion of drugs and depression and concluded that Andy should be admitted to the hospital's psychiatric unit for seventy-two hours. He discussed voluntary admission for in-patient treatment of Andy's depression and the family agreed that that approach was desirable. As a result, Andy signed a Request for Voluntary Admission that night which would immediately admit him to Doctors Memorial Hospital's psychiatric ward for seventy-two hours. While the admission was being processed, the hospital staff realized that Andy was missing. After a search of the hospital and grounds, Sam found Andy in their car smoking a cigarette. He returned to the emergency room without resistance. The staff then learned that the admission was blocked because the hospital could not verify that the Tabors' Blue Cross health insurance would cover psychiatric care. In such a situation, hospital policy requires a $400.00 deposit which the family did not have. Hospital policy also allows the physician to waive the $400.00 requirement when the patient is a true emergency. The three nursing personnel in the emergency room advised Dr. Dunn of the waiver. At least one nurse told Dr. Dunn that he thought that Andy's condition presented an emergency. However, Dr. Dunn decided that Andy was not a true emergency and did not execute the waiver. The family was told to watch Andy and to contact his private physician.
Andy spent the remainder of the night at his parents' apartment. The next day, July 4, Mrs. Tabor tried to reach Dr. Lautner, but learned that he was out of town until *236 after the holiday. Other efforts to obtain medical help were unsuccessful. Andy was still somewhat incoherent, drifting in and out of sleep. His parents took turns sitting with him. Despite their supervision, Andy distracted them and left the apartment through a window during the mid-afternoon. His parents found him shortly thereafter walking back to their home. Later, when the family sat down to supper, Andy seemed fine. After supper, he said he needed some time to himself and wanted to go to his own apartment for a few minutes. His parents objected, but Andy said he needed some time alone and left. A few minutes later, Sam called Andy to check on him. Andy said he was fine and that he would be back in a few minutes. He asked Sam to give his parents and his older sister all his love. That message alerted Mr. Tabor. Sam and he rushed over to the apartment and found Andy with a self-inflicted gunshot wound to the heart. Andy died on the scene. A few days later, an undated suicide note was found in one of Andy's dresser drawers.
In response to a complaint filed by the Tabors, a Medical Review Panel investigated the incident. The panel found that Dr. Dunn failed to comply with the appropriate standard of care, but that this was not a cause of Andy's death.[3] Mr. and Mrs. Tabor then filed suit against Doctors Memorial Hospital (the hospital)[4], Dr. Dunn, and his employer, Emergency Physicians Association, Inc., alleging negligence in failing to admit Andy, in failing to properly instruct them on the precautions to take and the effects of quaaludes, and in failing to transfer Andy to a facility which could treat him. The case was tried before a jury. After the close of all the evidence, the judge granted defendants' motions for directed verdict. Plaintiffs appealed and the court of appeal reversed and remanded for a new trial.[5] At the second trial, the jury returned a special verdict in favor of both the hospital and the doctor finding that neither defendant was at fault. Judgment was entered in favor of all defendants. Plaintiffs appealed. With one judge dissenting, the court of appeal found that Dr. Dunn had not complied with the appropriate standard of care, but concluded that the actions of the defendants were not the cause of Andy's death.[6] Upon plaintiffs' application to this court, we granted certiorari to determine the correctness of that decision.[7]

DR. JOHN D. DUNN
As provided in La.R.S. 9:2794:
A. In a malpractice action based on the negligence of a physician ..., the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff *237 suffered injuries that would not otherwise have been incurred.
* * * * * *
C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician
. . . .
Under this statute, plaintiffs must establish the standard of care required of Dr. Dunn, that Dr. Dunn's conduct fell below that standard, and that this conduct was a cause of Andy's death. Plaintiffs have the burden of proving their case by a preponderance of the evidence.
Concerning the standard of care, Dr. Philip L. Cenac, Jr., a psychiatrist on the Medical Review Panel, testified that the panel concluded that in-patient treatment was optimal in this situation. Further, Dr. Cenac stated that hospitalization is the optimal standard of care in the Baton Rouge area if an emergency room physician feels that a patient is suicidal. In his opinion, the diagnosis of depression with overdosage of quaaludes warranted hospitalization. Plaintiffs' expert witness, Dr. Frank J. Baker, a physician board certified in emergency medicine, testified that the standard of care for an emergency physician is to "absolutely" execute the waiver and admit a patient with a diagnosis of quaalude ingestion and depression. John Johnson, a licensed practical nurse employed by the hospital and working in its emergency room for over one year, testified that the standard course of treatment there, when faced with a pending medical problem from drug ingestion and a possible psychiatric problem, was admission to the psychiatric ward. Dr. Dunn offered no evidence to refute this testimony.
Concerning Dr. Dunn's conduct, July 3, 1981 was his first night at the hospital as the emergency room physician. Dr. Dunn testified that he did not review the hospital policy that night, but that he was familiar with the emergency room policies because he had previously admitted patients to Doctors Memorial Hospital. He recalled that two members of the nursing staff, Nurse Johnson and Kathleen Miller, a registered nurse, advised him that he could waive the $400.00 requirement. Dr. Dunn testified that Andy gave him the impression that this was recreational drug use. He said that Andy told him that he and his friends had taken drugs and drank a few beers. Dr. Dunn diagnosed depression and drug ingestion, but could not evaluate the level of depression while Andy was under the influence of the drugs. Dr. Dunn acknowledged that he was aware of Andy's recent depression, the reasons for it, and that Andy was being treated as an out-patient. He said that he "absolutely" recognized the potential for a depressed patient to become suicidal. He also testified that the combination of drugs and depression creates a suicide risk and that alcohol increases the effects of quaaludes although it does not affect the elimination phase, i.e., how long the drug stays in the body.[8] Despite this, Dr. Dunn did not feel that Andy presented an emergency or that Andy was suicidal. Dr. Dunn stated that he initiated discussion of in-patient treatment, not because he felt that Andy would hurt himself, but because he wanted to help the Tabor family who obviously cared about their son. When the admission was blocked, Dr. Dunn did not change his diagnosis, but did change the treatment recommending that Andy's family watch him and that Andy see his private physician. He indicated that Andy was still under the influence of quaaludes when he left the hospital. However, Dr. Dunn concluded that Andy posed no risk from a medical standpoint[9] and that he could sleep off the drugs in his family's home.
*238 Dr. Cenac agreed that Andy was still under the influence of quaaludes when he was in the emergency room. He testified that the influence of the drugs, combined with a depressive state, is a dangerous condition. Dr. Baker stated that Andy could not be safely released to his family while he was under the influence of the drugs. Nurse Johnson testified that he evaluated Andy before Dr. Dunn saw him. Andy was the only patient in the emergency room at the time. Andy told Nurse Johnson that he had taken the drugs to "mellow out" and that he was depressed and hurt by some things going on in his life. Nurse Johnson stated that he told Dr. Dunn that he thought this was an emergency and he also advised Dr. Dunn of the waiver. He said that he heard Nurse Miller also tell Dr. Dunn about the waiver; however, Nurse Miller testified that she does not recall discussing the waiver with Dr. Dunn. The third hospital employee on staff that night, Laura M. Edmunds, a nursing assistant, testified that she told Dr. Dunn about the waiver twice. Plaintiffs testified that they specifically remembered discussing Andy's depression with Dr. Dunn.
The record supports a finding that Dr. Dunn's conduct was below the appropriate standard of care. He knew that Andy was depressed and had taken an overdose of sleeping pills. He knew that this combination was dangerous and created a suicide risk. He knew that alcohol increased the effects of quaaludes. Dr. Dunn first decided to admit Andy, but changed his treatment when the admission was blocked by the required $400.00 deposit. He was advised of the waiver by all three nursing personnel, and at least one nurse told Dr. Dunn that he felt that Andy's condition presented an emergency. Yet, while Andy was still under the influence of quaaludes, Dr. Dunn decided not to execute the waiver and released him from the hospital. Under these circumstances, we find that plaintiffs proved by a preponderance of the evidence that Dr. Dunn failed to use reasonable care, diligence, and best judgment when he did not admit a depressed patient who was under the influence of drugs. The jury was clearly wrong in finding otherwise.[10]
The next question is whether this conduct was a cause of Andy's death. In medical malpractice actions, this court has held that a plaintiff need not prove that "a patient would have survived if proper treatment had been given, but only that there would have been a chance of survival." Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713, 720 (La.1986). "Defendant's conduct must increase the risk of a patient's harm to the extent of being a substantial factor in causing the result but need not be the only cause." Id. Had Dr. Dunn signed the waiver, Andy would have been admitted to the hospital's psychiatric ward for seventy-two hours. Andy committed suicide approximately fifteen hours after leaving the emergency room, clearly within the seventy-two hour period. Drs. Dunn and Cenac stated that suicide prevention cannot be guaranteed on a psychiatric unit. However, Dr. Cenac testified that the probability that the patient will commit suicide is lessened when the patient is admitted to a psychiatric unit because the patient is physically observed by trained personnel. Further, testimony established that the psychiatric ward would have contacted the psychiatrist on-call that night and that Andy would have been seen by a psychiatrist on rounds the next morning. Dr. Dunn also testified that admission would have allowed Andy to be seen by a psychiatrist who could better advise the family on proper care. The record supports a finding that admission would have given Andy a chance of survival. Andy would have received immediate psychiatric care and have been physically observed by trained personnel. We find that Dr. Dunn's conduct was a substantial factor in the cause of Andy's death.[11] The court of *239 appeal erred in finding otherwise. Accordingly, plaintiffs have met their burden of proving Dr. Dunn liable in this medical malpractice action.

EMERGENCY PHYSICIANS ASSOCIATION, INC.
Having found that Dr. Dunn was negligent, we address the liability of Emergency Physicians Association, Inc. (EPA). EPA contracted with all the hospitals in the Baton Rouge area, except Earl K. Long Hospital, to provide emergency room coverage. Dr. Dunn testified that he was employed by EPA. Further, he acknowledged that the physician decides whether a patient is appropriate for waiver of the admission deposit. This testimony was not disputed. The record supports a finding that Dr. Dunn was employed by EPA and that his negligent conduct occurred within the course and scope of his employment. Hence, we find Emergency Physicians Association, Inc. liable for the negligence of Dr. Dunn under the theory of respondeat superior.

DOCTORS MEMORIAL HOSPITAL
As provided in La.R.S. 40:2113.4:
A. Any general hospital licensed under this Part ... which offers emergency room services to the public and is actually offering such services at the time, shall make its emergency services available to all persons residing in the territorial area of the hospital regardless of whether the person is covered by private, federal Medicare or Medicaid, or other insurance.... However, in no event shall emergency treatment be denied to anyone on account of inability to pay....
B. For purposes of this Section, "emergency" means a physical condition which places the person in imminent danger of death or permanent disability.... "Emergency services" means those services which are available in the emergency room and surgical units in order to sustain the persons' [sic] life and prevent disablement until the person is in condition to be able to travel to another appropriate facility without undue risk of serious harm to the person....
Further, "[a] hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require [and] to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and the facts of that case." Hunt v. Bogalusa Community Medical Center, 303 So.2d 745, 747 (La.1974).
The staff at Doctors Memorial Hospital's emergency room treated Andy's physical condition without regard to finances. The issue of money arose when he was to be admitted for psychiatric care. The hospital policy at issue reads as follows:
Credit Policies

Psych Admissions at Doctors Memorial Hospital
. . . . .
B. Insurance Patients
. . . . .
2. Unverified Insurance Patients
A. For psych patients who have insurance that could not be verified (night and weekend walk-in admissions) and who do not have a bad debt or current balance on the books, a $400 deposit must be collected before admission....
Hospital policy also provides that:
EMERGENCY ADMISSIONS
We are to continue the careful screening of Emergency Room patients that request admission. In the event that a patient does not meet the financial standards of the hospital and cannot produce the necessary deposit, the patient is to be denied admission
UNLESS
The patient is a true emergency admission AND the physician signs the "Emergency Admission Confirmation" form....
*240 Testimony established that Doctors Memorial Hospital is a privately operated, for profit facility. Dr. Baker testified that he was familiar with emergency room procedures and policies across the nation and that they were analogous to those at Doctors Memorial Hospital. Dr. Cenac stated that the policies at the hospital constituted "perfectly normal hospital operation." Dr. Dunn testified that he worked as a consultant at numerous emergency rooms across the nation all having rules and policies similar to those at Doctors Memorial Hospital. Further, Drs. Baker and Dunn reported that the Joint Commission on Accreditation of Hospitals outlines the policies which hospitals must follow to uphold their accreditation. Under these policies, the physician decides whether a patient is appropriate for waiver of the $400.00 admission deposit. This is a reasonable delegation of authority for determination of which patients present a true emergency. Based on the record, we do not find the hospital negligent as a result of the policies it had in operation.
Moreover, we do not find the hospital liable under the theory of respondeat superior because of the failure of Dr. Dunn to execute the waiver and admit Andy. Testimony established that Dr. Dunn was not an employee of the hospital but was employed by Emergency Physicians Association, Inc. William H. Malloy, chief executive officer at Doctors Memorial Hospital in 1981, testified that the hospital contracted with EPA to provide emergency physician care. The officers of EPA decided which physician would come on duty. Hence, the hospital is not liable under the theory of respondeat superior. Under the circumstances of this case, we find that Doctors Memorial Hospital did not breach its duty to provide Andy with the care required by his condition. Accordingly, we agree with the jury and the court of appeal in this regard.

COMPARATIVE FAULT
We turn next to the issue of plaintiffs' comparative fault. Parents must use reasonable precautions with regard to a child under their supervision as judged by common sense standards for a reasonably prudent person under similar conditions and circumstances. Argus v. Scheppegrell, 472 So.2d 573 (La.1985). Mr. Tabor testified that Andy talked about suicide when he woke up on July 4. Andy told his father that he had "messed up" with the drugs and that he would "do it" with something else. Mr. Tabor stated that he did not feel that Andy was suicidal prior to the events of July 3, but, by the time they arrived at the emergency room, he felt that Andy had tried to harm himself. Further, he testified that he recognized that Andy had a serious problem which needed attention. Mrs. Tabor testified that she knew about the suicide conversation between Andy and her husband. She stated that she did not think that Andy had taken the drugs for recreational purposes. Her impression was that he was "yelling for help." In an effort to get assistance on July 4, Mrs. Tabor called the Crisis Center and Earl K. Long Hospital. She also tried to reach Dr. Lautner, but was told by his answering service that he would be out of town until after the holiday. She did not leave a message, ask if a physician was on-call for him, or relate that this was an emergency situation. Both plaintiffs testified that they were not aware of any prior suicide attempts or drug abuse by Andy; however, Mrs. Tabor testified that she had a feeling that Andy smoked marijuana. Nurse Johnson testified that he told the Tabors they could take Andy to Earl K. Long Hospital and that he also gave them the name of the psychiatrist on-call at Doctors Memorial Hospital. Further, Dr. Dunn testified that he told the family they could return to the hospital in the morning when a psychiatrist would be there.
We find that plaintiffs, who believed that Andy had a serious problem, did not use reasonable precautions with regard to their son. Andy talked about suicide with them for the first time. He abused drugs for the first time. He managed to escape from their apartment while they were watching him. Despite these circumstances, plaintiffs did not pursue options open to them. They did not take Andy to Earl K. Long Hospital which they knew had psychiatric *241 facilities. They did not try to contact the psychiatrist on-call at Doctors Memorial Hospital. They did not return to the hospital the next morning. They did not leave a message for Andy's private physician, ask if an on-call physician was available, or relate to the answering service that this was an emergency. Moreover, despite their concerns that he had tried to harm himself, they let him leave their apartment unsupervised. Hence, applying the factors used by this court in Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967 (La.1985), we find Mr. and Mrs. Tabor to be twenty percent at fault and Dr. Dunn to be eighty percent at fault.

DAMAGES
Because the lower courts did not find the defendants liable, they did not reach the issue of damages. The record shows that the Tabors were a close family. When the plaintiffs were experiencing financial difficulties, their sons moved in with them and contributed their salaries to the household. Andy and Sam cared for their father during his recovery from his aneurysm while their mother was away caring for her father. Andy and Sam lived and worked together. Their apartment was just around the corner from their parents' home. After the boys moved, the family still saw each other on a daily basis, often sharing meals. The family demonstrated its closeness by all accompanying Andy to the emergency room. Accordingly, we fix damages for the loss of their son at $150,000.00 for James Fenton Tabor and $150,000.00 for Mary Florence Tabor, each to be reduced by twenty percent.

DECREE
For the reasons assigned, the judgment of the court of appeal is affirmed in part and reversed in part. The judgment in favor of HCA Health Services of Louisiana, Inc. d/b/a Doctors Memorial Hospital is affirmed. The judgment in favor of Dr. John D. Dunn and Emergency Physicians Association, Inc. is reversed. Judgment is rendered in favor of James Fenton Tabor and Mary Florence Tabor and against Dr. John D. Dunn and Emergency Physicians Association, Inc., in solido, in the amount of $150,000.00 for each plaintiff, each to be reduced by twenty percent, together with legal interest from the date of judicial demand until paid. Costs are assessed in accordance with the parties' percentages of fault.
COLE, Justice (concurring in part, dissenting in part).
I agree with the majority opinion insofar as it finds Dr. Dunn's conduct fell below the appropriate standard of care. However, I disagree with the majority's conclusion that this conduct was a "substantial factor in the cause" of Andy's death.
Our law distinguishes between two types of causation: substantial (or legal) cause and cause in fact. Simply because an event may be deemed a cause in fact does not necessarily mean it is a substantial cause. By contrast, it is well settled that when an accident results from two acts of negligence, one more remote and one an intervening cause, the presence of the intervening cause prevents a finding of liability on the part of the one responsible for the more remote cause. Reeves v. Louisiana and Arkansas Railway Co., 282 So.2d 503 (La.1973); Hessifer v. Southern Equipment, Inc., 416 So.2d 368 (La.App. 1st Cir.1982), writ denied, 420 So.2d 982 (La.1982). We recognized the applicability of this principle to the medical malpractice context in Hasting v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986), where we stated the doctors's conduct must be a "substantial factor" in causing the harm. 498 So.2d at 720.
Applying these precepts to the present fact situation, it is clear Dr. Dunn's conduct was a cause in fact of Andy's suicide (i.e., the suicide probably would not have taken place at the time it did take place, if Andy had been admitted into the hospital), but any negligence on the part of Dr. Dunn was superceded by the intervening negligence of Andy's family. Although Dr. Dunn did not admit Andy to the hospital, he instructed Andy's family to watch him and to contact his private physician. During the fifteen hour period that followed, *242 the record reveals numerous options were open to Andy's family. They could have left a message for Andy's personal physician, informing him of the emergency. They could have taken Andy to the psychiatric facilities at Earl K. Long Hospital, or contacted the psychiatrist on-call at Doctor's Memorial Hospital. At the very least, they could have supervised Andy more closely and not allowed him to leave the apartment. The failure of Andy's family to pursue these options, as well as Andy's own determination to take his life, constituted an intervening cause which negates a finding of substantial cause on the part of Dr. Dunn. Further, since Dr. Dunn's conduct was not a substantial cause of the accident, it follows his employer, Emergency Physicians Association, Inc., should not be held liable.
Therefore, I respectfully concur in part and dissent in part from the majority's opinion.
NOTES
[*] Judge Thomas C. Wicker, Jr. of the Fifth Circuit Court of Appeal participated in this decision as Associate Justice Ad Hoc sitting for Judge Melvin A. Shortess of the First Circuit Court of Appeal sitting as Associate Justice Pro Tempore.
[1] Testimony established that quaaludes are sleeping pills which were commercially produced in the 1970's. The drug was banned by the Federal Drug Administration in the late 1970's after its propensity for abuse and dependency became known. The onset of the drug is rapid inducing sleep within thirty minutes. The drug abuser fights off the sleep and then experiences euphoria, reduced inhibitions, slurred speech, and giddiness. In 1981, quaaludes were a common drug of abuse.
[2] A bilirubin test measures liver function and was ordered because quaaludes are metabolized in the liver.
[3] In the reasons supporting its opinion, the panel stated that Dr. Dunn's change in recommended treatment from hospitalization to out-patient care lowered the level of care from optimal to satisfactory.
[4] The correct name of this defendant is HCA Health Services of Louisiana, Inc. d/b/a Doctors Memorial Hospital.
[5] 501 So.2d 243 (La.App. 1st Cir.1986).
[6] 554 So.2d 849 (La.App. 1st Cir.1989).
[7] 558 So.2d 560 (La.1990).
[8] Testimony established that quaaludes have a half-life of two to four hours. Medically, half-life means the time the body takes to deactivate one-half of the drug available in the blood stream. Ninety-nine percent of the drug passes through the stomach wall into the blood stream. One percent of the drug is stored in fat tissues and is slowly released into the blood stream. The elimination half-life of this one percent is ten to forty hours.
[9] The physical exam was normal with the exceptions of uncoordination and dysfunctionmuch like a drunken personand mild lethargy.
[10] The court of appeal concluded that the clear weight of the evidence would require finding that Dr. Dunn did not comply with the appropriate standard of care.
[11] The jury found that Dr. Dunn's conduct was not a factor in causing the death of Andrew Tabor. However, having found that Dr. Dunn was not at fault, the jury did not have to address this question.