GOTHARD, Judge.
In this medical malpractice suit, Angelina Chauvin, individually and in behalf of her two minor daughters, seeks damages for the death by suicide of her husband, David Chauvin.
The decedent, thirty years old, had been a psychiatric patient at West Jefferson Mental Center (WJMHC) since his teens. He was deemed to be borderline mentally retarded, was chronically depressed, and had at times abused alcohol and drugs. He worked spasmodically as a roofer for family members. Dr. David Mitchell was his treating psychiatrist at WJMHC, having seen him first in 1980. Chauvin was maintained on an anti-depressant and anti-anxiety medication, Sinequan, which the Center dispensed to him monthly, a supply of 90 tablets. He saw Dr. Mitchell about every six months and saw a registered psychiatric nurse for the intervening months.
On January 6, 1987, Chauvin kept an appointment with Dr. Mitchell at 1:00 p.m., received the medication, went back to his mother’s house, and soon afterward ingested the ninety pills. He died a few minutes after his arrival at an emergency room. In June, 1986, Chauvin had been hospitalized for two weeks for valium and alcohol withdrawal and suffered a psychotic depression.
On April 10,1987, Mrs. Chauvin filed suit against WJMHC, Dr. Mitchell and Dr. Helen Mason. She voluntarily dismissed the claim against the two psychiatrists and proceeded against WJMHC, Dr. Mitchell’s employer. Trial was held before a judge and on July 25, 1991, judgment was signed in favor of the defendant, dismissing the plaintiff’s demands. This appeal followed.
The issues presented by the appellants are whether WJMHC, through its employee/physician, failed to comply with the standard of care for physicians practising psychiatry by prescribing and dispensing a lethal number of Sinequan tablets to the decedent and, if so, what amount of damages should be awarded.
In Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1276 (La.1991), the Supreme Court set out the requirements for a finding of liability in a medical malpractice suit, as follows:
In a medical malpractice action against a physician, the plaintiff carries a twofold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor’s treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; Smith v. State through DHHR, 523 So.2d 815, 819 (La. 1988); Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 723 (La.1986)....
The Court explained further that in a case where the patient dies, the plaintiff is not required to prove that the patient would have survived if properly treated, only that the defendant’s malpractice resulted in the loss of his chance of survival.
Causation is a factual finding which should not be reversed on appeal in the absence of manifest error. Martin, supra, at 1278; Tabor v. Doctors Memorial Hospital, 563 So.2d 233 (La.1990). It was agreed by the expert psychiatrists who testified and Doctors Mitchell and Mason, the WJMHC psychiatrists, that psychiatrists treating a person with a history of depression or alcohol abuse should be cautious in deciding upon the amount of medication to be dispensed. When the psychiatrist has reason to think the patient is a suicide risk, he should restrict the medication to the smallest feasible amount.
*136 The appellant argues that Dr. Mitchell, having treated Mr. Chauvin for many years, was well aware of his prior history of depression, self destructive behavior, alcohol or drug abuse, and prior suicide gestures, but did not restrict the amount of Sinequan.
The plaintiffs’ expert, Dr. Richard Ri-choux, testified that in his opinion, prescribing and dispensing 90 tablets of Sine-quan to a significantly depressed patient constituted a deviation from the standard of care applicable to psychiatry and that a week’s supply of the drug would have been appropriate in consideration of Chauvin’s mental and personality characteristics.
Dr. Kenneth Ritter testified for the defendant that he felt that Dr. Mitchell’s prescription of 90 tablets was not inappropriate. He explained that since Chauvin had been given the dosage over a long period of time and “there was no indication of any personality change or ... reported change in his behavior by anyone so that there was no reason to alter that particular dosage or that particular level of prescribing.” Dr. Ritter stated also that he felt the standard for prescribing medication for a patient should be the psychiatrist’s judgment:
... your clinical judgment as to what’s going on with that patient and whether or not he is suicidal, whether or not he poses a risk. That’s the standard rather than the number of pills you prescribe.
His review of the record indicated that after his discharge from the hospital Chau-vin was improving as of September and October, 1986. The anti-psychosis drug had been discontinued and he had recovered from a major depressive episode.
A second expert for the defendant, Dr. Edward Norman, found that Chauvin had shown improvement in October, November, and December and saw no reason why the same medication which had been effective before should not be given. He stated that one month’s dosage was a necessity in a clinic, where patients were seen intermittently.
On cross examination Dr. Richoux agreed that according to the WJMHC notes Chauvin was doing well in comparison to how he’d gotten along during much of the ten year period. When asked whether the record showed that Dr. Mitchell should have had some indication that Chauvin was considering suicide on January 6, Dr. Ri-choux answered, “not necessarily” and agreed that he did not criticize the doctor for failing to be “prescient.”
Dr. Mitchell’s testimony indicates that he was appropriately concerned about the possibility of intentional or accidental misuse of the medication and frequently cautioned his patient to take it only as directed and not to drink. When Angelina Chauvin appeared at the center on March 21, 1986 and reported that her husband had been drinking to excess while taking Sinequan, Dr. Mitchell directed the nurse to tell her that no more Sinequan would be dispensed until Chauvin had been seen at the clinic.
It was vital to Chauvin’s treatment that his psychiatrist be informed when problems arose at home; however, Mrs. Chauvin frequently failed to provide Dr. Mitchell with necessary information. There was no word from the patient or his wife during April and May, 1986, after Mrs. Chauvin’s report that Chauvin was drinking to excess. Mrs. Chauvin called WJMHC on June 10 to say that she had checked her husband into Charity Hospital for valium and alcohol withdrawal. She explained that another physician had given Chauvin prescriptions of valium “for his nerves,” and when he stopped taking it he began hallucinating. Dr. Mitchell stated that had he been informed of the valium and alcohol, he would have referred Chauvin to a substance abuse clinic or committed him.
Dr. Mitchell’s note of January 6, 1987 reads, “split from wife — says she was fooling around on him.... ” Another note, written January 8, states:
During visit on 1/6/87, David gave no indication of suicidal ideation. He was not crying or saying he wanted to die.
Chauvin’s mother, Mrs. Guillot, testified that a few days before his death her son had told her that he did not want to live anymore. She insisted that she called the Center with the information, the person *137 who answered said she would ask Dr. Mitchell to call back, and the call was not returned. Nurse Clayton testified that such a report would have received immediate attention at WJMHC.
Sgt. Curtis Snow testified that immediately after Chauvin was taken to the hospital Mrs. Chauvin told him her husband had been “depressed over their separation” and had called to tell her he wanted to reconcile. They had separated two weeks earlier following a violent argument, when the police were summoned and arrested Chau-vin. At trial Mrs. Chauvin denied making the statement, maintaining that they had not at any time been separated. Her credibility on this point is very dubious, and the Center should have been informed of Chau-vin’s depression.
The trial judge concluded his reasons for judgment as follows:
The Court finds that, based on the information available to them on January 6, neither Dr. Mitchell nor West Jefferson Mental Health Center breached the standard of care in the treatment of Mr. Chauvin. Mr. Chauvin exhibited no suicidal tendencies when Dr. Mitchell saw him on January 6, the date on which Mr. Chauvin committed suicide_ Al-
though there was testimony from Mr. Chauvin’s wife and other family members as to his depression and statements regarding suicide, this information was never transmitted to Dr. Mitchell or anyone else at WJMHC. For this reason, the defendant cannot be held responsible for the insight into Mr. Chauvin’s condition that this information would have given them.
As we find that the court’s finding are reasonable in light of the record reviewed in its entirety, we affirm the judgment below.
AFFIRMED.