714 So.2d 742 (1998)
Mary Jones PHILLIP, Plaintiff-Appellant,
v.
UNIVERSITY MEDICAL CENTER, et al., Defendants-Appellees.
No. 97-302.
Court of Appeal of Louisiana, Third Circuit.
April 22, 1998.
Rehearing Denied July 7, 1998.
*743 James Paul Lambert, Lafayette, for Mary Jones Phillip, in her own capacity.
Richard Phillip Ieyoub, Jude David Bourque, Baton Rouge, for University Medical Center, et al.
Guy Boudreaux, for Broussard Bros., Inc.
Felix Wiltz, Agent, for Creole Dredging and Construction, Inc.
Before COOKS, SAUNDERS, DECUIR, PETERS and SULLIVAN, JJ.[*]
SULLIVAN, Judge.
Plaintiff, Mary Jones Phillip, in her individual capacity and as administratrix of the estate of her deceased husband, Joseph Nick Phillip (Phillip), sued the University Medical Center (UMC) and the State of Louisiana, through the Department of Health and Hospitals, alleging that defendants' acts of medical malpractice caused Phillip's wrongful death. At the close of plaintiff's presentation of evidence, the trial court granted defendants' motion for involuntary dismissal, thereby dismissing plaintiff's claims with prejudice. For the following reasons, we affirm.

FACTS
On September 6, 1990, Phillip, along with his wife and their nephew, Rennis George, went from their home in Iberia Parish to the *744 Acadiana Mental Health Unit in Lafayette. They were seeking help for Phillip's problems related to alcohol abuse. Both Phillip and George drank beer on the way to Lafayette. The parties were referred to the Lafayette Alcohol and Drug Abuse Clinic (LADAC), a facility separate from the mental health unit, which is located on the second floor in the same building. LADAC is an outpatient treatment facility.
Brian Simpson, a case manager employed by LADAC, screened both Phillip and George for referral. At the time of this meeting, Simpson was not a certified substance abuse counselor.
Plaintiff alleged that, during the screening, Phillip told Simpson that he needed help with his drinking problem and that he had experienced suicidal and homicidal thoughts during the three or four weeks before the visit. Simpson denied that Phillip told him of his suicidal and homicidal thoughts, but he did not recall attempting to elicit this information from Phillip. Nevertheless, Simpson insisted that, if Phillip had mentioned "suicide," he would have taken it seriously, written it down, and walked Phillip downstairs to the Acadiana Mental Health Unit for psychological treatment. Simpson further stated Phillip and George appeared jovial and "not at all depressed" during the screening.
After completing the screening process, Simpson determined Phillip and George required detoxification followed by inpatient treatment. He informed them that detoxification services were offered at three facilities: UMC in Lafayette, the Briscoe Center in Lake Charles, and a third facility in Pineville. Simpson and George selected UMC because it was closest to their homes. Simpson then telephoned UMC's detoxification unit, known as the First Step program. He also put them on a waiting list at the Fairview inpatient treatment center located in Bayou Vista.
By telephone, a UMC staffer screened both men. Simpson did not participate in this screening. Plaintiff maintained that Phillip told the UMC screener about his depression and suicidal thoughts. UMC denied this. The UMC phone screen sheet has four questions relating to suicidal ideations. The phone screen notes written by UMC's employee during the interview were lost. UMC maintained that, had Phillip told the screener he was suicidal, Phillip would have been instructed that he was not eligible for admission. As a policy, suicidal patients are ineligible for admission as patients in the UMC First Step program.
UMC admits that Phillip and George were told by the screener that no beds were available at the time and that they had to wait until beds were available before being admitted to the detoxification unit. Phillip was instructed to call back or UMC would call them him when a bed was available.
The two men and the plaintiff returned to their homes. Plaintiff alleged Phillip called UMC a minimum of two times to inquire about the availability of a bed. Allegedly, he was told there was no chart on him and he was not on a waiting list. According to plaintiff, Phillip became more depressed and ten days after his visit to LADAC he committed suicide by shooting himself.

PROCEDURAL HISTORY
Plaintiff filed a medical malpractice claim against UMC and the State, through the Department of Health and Hospitals, to recover damages for the wrongful death of her husband. Plaintiff alleged two agencies, UMC and LADAC, were negligent in causing the death of her husband. The claims against LADAC and UMC were separately reviewed by two different medical review panels. Each panel found UMC and LADAC failed to meet the requisite standard of care, but held that the substandard conduct of each was not a substantial factor in causing Phillip's death.
The case was tried by the court without a jury. After plaintiff completed her case, the State filed a motion for involuntary dismissal. The trial court granted the motion and dismissed plaintiff's case with prejudice. In so doing, the trial court gave oral reasons for dismissal, in pertinent part, as follows:
Based on this Court's evaluation of the facts and the witnesses, the Court finds there was no mention of suicide by anyone to Mr. Simpson. Furthermore, the Court *745 finds there was no mention of suicide to the UMC phone screener when they screened Mr. Phillips on the telephone. The Court finds this to be the most creditable version of the facts because if suicide had been mentioned by anyone, as plaintiff contends, then the Court finds that Mr. Simpson would have written it down on the referral form, and that UMC would also have informed Mr. Phillip that he was ineligible for admittance to the First Step detox unit. Mr. Simpson made no reference to suicide on the referral form, and both plaintiff and defendants contend that Mr. Phillip was not denied admission to the detox unit on the basis of suicidal thoughts, but was denied admission due to lack of an available bed.
Also, the Court finds that there was no return phone call by Mr. Phillip to UMC after the LADAC visit. The Court finds as more believable Ms. Janice Fox's testimony that had Mr. Phillip called back at least two times, as testified to, and his paperwork was lost, UMC would have conducted a new phone screening and evaluation.
Based on the facts as found by the Court, this court must determine whether the plaintiff has established by a preponderance of the evidence that either UMC and/or LADAC breached a duty to Nick Phillip that was a substantial factor in causing his suicide ten days later.
The defendants have moved for involuntary dismissal of plaintiff's case on the grounds, first, that there was no breach of a duty owed Mr. Phillip, and second, that if there was a breach, then it was not a cause in fact of Mr. Phillip's suicide.
The first alleged breach was the lack of qualifications and/or evaluation performed by Mr. Brian Simpson. Plaintiff contends that in order to conduct an intake screening, the screener must be a certified substance abuse counselor as defined by Louisiana Revised Statute 3[7]:3373 through 3384. The Court finds that the intake screener did not have to be a certified substance abuse counselor, but such an intake screen could be performed by a case management worker who was properly supervised under LSDCSAC, Section 3381(C). And the Court further finds that Mr. Simpson was a properly supervised case manager under the applicable law and as it is applied by the Louisiana Association of Substance Abuse Counselors, the State Board that certifies substance abuse counselors.
However, the Court finds that a breach of duty did occur by Mr. Simpson by his failure to inquire into any suicidal ideations. The Court finds this failure to inquire into suicide was not a substantial factor in Mr. Phillip's suicide ten days later. Because Mr. Phillip denied suicidal ideations to the UMC screener within minutes of being interviewed by Mr. Simpson, it is more likely than not that Mr. Phillip would have also denied suicidal ideation to Mr. Simpson if he had been asked.
Plaintiff also alleges that LADAC breached its duty by not following up and calling Mr. Phillip back when Mr. Simpson knew UMC had not accepted Mr. Phillip because there were no beds available. The Court finds no breach of duty by LADAC in not calling Mr. Phillip back, as Mr. Phillip was told that he needed to check with UMC. At this point Mr. Phillip was referred to UMC, and it was incumbent on the plaintiff to finalize the referral or call LADAC back if he needed further assistance.
As to the alleged breaches of UMC, the Court finds that UMC did breach the standard of care by losing the phone screen and not calling Mr. Phillip back when a bed was available. However, this was not a substantial factor in Mr. Phillip's suicide ten days later because Mr. Phillip would never have been admitted had he acknowledged he was suicidal. He would have and should have been referred to the mental health unit, had he stated he was suicidal during the phone screen.
There was also testimony that over the next ten days Mr. Phillip became more depressed, hopeless, and suicidal and homicidal, and the family members recognized this and took no further action than the alleged return calls to the detox unit, which the Court finds did not occur, and *746 furthermore was not the appropriate place for a suicidal person.
Based on the foregoing, the motions of the defendants LADAC and UMC for an involuntary dismissal of plaintiff's claims are hereby granted at plaintiff's cost. Judgment will be signed upon presentation.
Plaintiff appeals and asserts the following assignments of error:
1) The trial judge committed an error of law in determining the scope of LADAC's duty to Nick Phillip.
2) The trial judge was clearly wrong in finding the breaches of duty by LADAC and UMC were not legal causes of Phillip's death.

STANDARD OF REVIEW
La.Code Civ.P. art. 1672(B) provides as follows:
In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.
In Mayes v. State, 96-789, p. 4 (La.App. 3 Cir. 12/11/96); 685 So.2d 497, 500, writ denied, 97-0113 (La.3/7/97); 689 So.2d 1376, this court explained the standard of review applicable to an involuntary dismissal as follows:
The trial court has much discretion in determining whether to grant a motion for involuntary dismissal. Continental Ins. Co. v. Three Seasons Pest Control Co., 94-1094 (La.App. 3 Cir. 2/1/95); 649 So.2d 1220; Mott v. Babin Motors, Inc., 451 So.2d 632 (La.App. 3 Cir.1984). In making a determination on a motion for involuntary dismissal, the trial court is not required to review the evidence in the light most favorable to the plaintiff. Shafer v. State, Through DOTD, 590 So.2d 639 (La. App. 3 Cir.1991). The judge is only required to weigh and evaluate all of the evidence presented up to that point and grant a dismissal if the plaintiff has failed to establish his claim by a preponderance of the evidence. Liberto v. Rapides Parish Police Jury, 95-456 (La.App. 3 Cir. 11/2/95); 667 So.2d 552. An involuntary dismissal authorized by La.Code Civ.P. art. 1672 should not be reversed in the absence of manifest error. Marcotte v. Travelers Ins. Co., 258 La. 989, 249 So.2d 105 (La. 1971); Liberto, 667 So.2d 552.
Plaintiff asserts that the manifest error standard of review is not applicable because the trial court committed an error of law in construing too narrowly the duties owed to her late husband by LADAC. She contends that this alleged legal error interdicted the fact finding process and requires this court to review the evidence de novo and apply the correct legal principles. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.App. 3 Cir. 2/20/95); 650 So.2d 742.
Plaintiff points to the testimony of her experts, Dr. Phillip Landry and Dr. David Legendre, as establishing that, after Simpson referred Phillip to UMC, LADAC had a duty to follow-up by communicating with Phillip and UMC to assure that Phillip received the treatment for which he was referred. She also asserts that the testimony of Joyce Ben, LADAC's administrator, established that Simpson should have looked for an alternative treatment facility when informed that UMC had no beds. Plaintiff urges that the duty of LADAC encompassed properly screening Phillip, following up on his placement and care, and exploring other treatment options and facilities when immediate treatment could not be obtained at UMC.
"Duty is a question of law. Simply put, the inquiry is whether the plaintiff has any lawstatutory, jurisprudential, or arising from general principles of faultto support his claim." Faucheaux v. Terrebonne Consol. Gov't, 615 So.2d 289, 292 (La.1993). In Smith v. State Through Department of Health and Human Resources Administration, 523 So.2d 815, 819 (La.1988), the supreme court explained:

*747 In a medical malpractice action against a hospital, the plaintiff must prove, as in any negligence action, that the defendant owed the plaintiff a duty to protect against the risk involved, that the defendant breached that duty, that the plaintiff suffered an injury, and that the defendant's actions were a substantial cause in fact of the injury. See Sibley v. Board of Supervisors of Louisiana State University, 477 So.2d 1094, 1099 (La.1985); Belmon v. St. Frances Cabrini Hosp., 427 So.2d 541 (La.App. 3 Cir.1983); Biggs v. United States, 655 F.Supp. 1093, 1094 (W.D.La.1987). "A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require," and to protect the patient from "external circumstances peculiarly within the hospital's control." Hunt v. Bogalusa Community Medical Center, 303 So.2d 745, 747 (La.1974).
The trial court can accept or reject the testimony of experts and should evaluate such testimony in the same manner as lay testimony. The trial court is not bound by expert testimony and is vested with broad discretion to determine its effect and weight. Pendleton v. Barrett, 97-570 (La.App. 3 Cir. 12/23/97); 706 So.2d 498.
We conclude that the trial court did not improperly construe LADAC's duty too narrowly. The trial court reasoned that LADAC did not have a duty to follow up with Phillip or UMC because Phillip had been referred to UMC for treatment and was given information on how to contact UMC. At that point, the trial court reasoned, the duty to follow up on treatment rested with Phillip and UMC. Under these circumstances, we agree with the trial court's determination of LADAC's duty under the law. The trial court could reasonably have determined that to impose a duty on LADAC to follow up on every person that is screened and referred to an outside agency would be unduly burdensome and would detract from the clinic's primary mission, the outpatient treatment of alcohol and drug abusers. Given that Phillip, his wife, and his nephew were aware of the referral to an outside agency, the UMC First Step program, and were given instructions on contacting UMC, we conclude that LADAC did not have a duty to later call Phillip or UMC to determine if in fact he was receiving the detoxification treatment for which he was referred.
Plaintiff's second argument, that Simpson had a duty to find alternative placement for Phillip when he learned that UMC had no beds, is without merit under these circumstances. The parties agree that Phillip was initially given a choice of three detoxification facilities: UMC, Briscoe Center in Lake Charles, and a third facility in Pineville. He chose to go to UMC because of its close proximity to his home. He also agreed to be put on a waiting list at UMC when he was told that no beds were available. No further placement efforts were made because Phillip preferred to undergo detoxification at the facility closest to his home. LADAC had no duty to place Phillip in an alternate facility after he agreed to be put on a waiting list at UMC and expressed his desire to not go to another facility.
In summation, we conclude that the trial court did not legally err in construing the duty owed to Phillip by LADAC. Therefore, the manifest error standard of review applies to the trial court's findings of fact and its determination to involuntarily dismiss plaintiff's case.

CAUSATION
In Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 720 (La.1986), the supreme court addressed a plaintiff's burden of proof on the issue of causation in the context of a wrongful death medical malpractice case. The court explained:
Once a breach of duty constituting malpractice is established, the question of whether the malpractice contributed to the death, i.e., lessened the chance of survival, is a question of fact for the jury. A substantial factor need not be the only causative factor; it need only increase the risk of harm.
(Citations omitted.)
The trial court concluded that the breaches of duty by Simpson, in failing to inquire about suicidal ideations, and by *748 UMC, in losing the phone screen and failing to contact Phillip, were not substantial factors in causing his suicide ten days later. In other words, the breaches of duty did not lessen Phillip's chance of survival. These findings were based upon credibility determinations. The trial court found, as a matter of fact, that Phillip made no references to suicide to Simpson and denied suicidal thoughts to the UMC phone screener. The trial court reasonably made this determination based on the evidence that, had Phillip expressed suicidal ideations to Simpson or the UMC phone screener, he would have been ineligible for the LADAC outpatient program and the UMC detoxification program. Phillip would not have been told that he was put on a UMC waiting list and he would not have been given the phone number to UMC to call and check for placement. We find no manifest error in the trial court's determination that Simpson's failure to ask about suicide, albeit a breach of duty, did not increase the risk of the suicide.
Phillip allegedly stopped drinking for two days after visiting LADAC, then he began drinking again and became despondent when he did not receive a call from UMC. Plaintiff alleged that Phillip called UMC and was told that there was no documentation of his prior phone screen and that he was not on the waiting list. However, the trial court determined that he in fact did not call UMC and that no family member who was aware of his depressed condition called UMC on his behalf. This determination was based on the testimony of Janice Fox, the First Step program director, who said that, if a staffer could not locate the prior phone screen when Phillip called, then another phone screen would have been conducted. No second phone screen was conducted. UMC admittedly did not call Phillip. The trial court found that, had UMC called Phillip and he had acknowledged his suicidal thoughts, he would have not been admitted to the detoxification program. We conclude that the trial court's conclusion that plaintiff did not prove causation between UMC's breaches of duty and the suicide is reasonable in light of the record reviewed in its entirety and is therefore not manifestly erroneous.

DECREE
For the foregoing reasons, the trial court's judgment granting defendant's motion for involuntary dismissal with prejudice is affirmed. All costs of this appeal are assessed to plaintiff-appellant, Mary Jones Phillip.
AFFIRMED.
COOKS, J., dissents and assigns reasons.
SAUNDERS, J., dissents.
COOKS, Judge, dissenting.
The trial court found, as did the medical review panels, that LADAC breached the standard of care by failing to inquire about Simpson's suicidal thoughts; and, UMC breached the standard of care by losing the telephone screen and not calling Phillip back when a bed became available. However, the judge concluded both LADAC's and UMC's substandard conduct did not contribute to Phillip's death. The trial court's ruling, thus, ultimately turned entirely on the judge's resolution of the cause-in-fact question.
In Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 720 (La.1986) the Supreme Court addressed a plaintiff's burden of proof on the issue of causation in the context of a wrongful death medical malpractice case. In articulating the plaintiff's burden, the court explained that:
Once a breach of duty constituting malpractice is established, the question of whether the malpractice contributed to the death, i.e., lessened the chance of survival, is a question of fact for the jury. A substantial factor need not be the only causative factor; it need only increase the risk of harm....
* * * * * *
It is not necessary to prove that a patient would have survived if proper treatment had been given, but only that there would have been a chance of survival....
* * * * * *
Defendant's conduct must increase the risk of a patient's harm to the extent of being a *749 substantial factor in causing the result but need not be the only cause.
See also Tabor, 563 So.2d at 238.
Plaintiff's experts testified admission to a treatment facility would have given Phillip an increased chance of survival. This testimony satisfied plaintiff's initial burden on the causation issue by a preponderance. Moreover, considering Phillip did not commit suicide until ten days after his visit to LADAC, timely follow-ups may well have deterred the tragic suicide. I believe the trial court erred in finding otherwise and his holding on this issue conflicts with the Supreme Court's reasoning in Tabor v. Doctors Memorial Hospital, 563 So.2d 233 (La.1990). In Tabor, the Supreme Court reversed a lower court decision and awarded damages to the parents of a son who committed suicide after the hospital refused him admission and wrongly diagnosed his condition as presenting a non-emergency. The Tabors and their son arrived at the hospital after he attempted to kill himself by swallowing thirteen quaaludes. The hospital refused admission because it could not verify if the parent's health insurance would cover psychiatric costs. The parents were unable to advance "on the spot" the $400 deposit demanded to secure their son's admission. The hospital could have waived the deposit once it determined the son required emergency care. However, the physician on call concluded the situation did not present a true emergency, and the son was sent home. Despite the parents attempt to monitor their son's condition, he eventually shot and killed himself. While finding the parents were negligent in a number of respects, the Supreme Court also found the hospital breached a duty of care owed to the son and awarded damages reduced by the parents' percentage of fault.
The trial court's conclusion that neither LADAC's nor UMC's substandard conduct contributed to Phillip's death ignores the Supreme Court's holding in Tabor. Further, the trial court's conclusion that UMC's substandard conduct did not contribute to Phillip's death because he would not have been admitted in the special detoxification program anyway also ignores the obvious. If UMC had not lost Phillip's chart, it would have called and informed him a bed was available at its facility, he would have arrived, and he would have been routed to the medical staff best able to treat his emergency condition at its facility. These "ifs" are not distant possibilities, but are a more likely and reasonable scenario but for the contributing conduct of UMC. Defendants admitted, in brief, UMC also provides care for suicidal patients.
I also find plaintiff's argument persuasive that the trial court additionally erred in narrowly defining the duty owed by LADAC to Mr. Phillip, particularly considering the experts' testimony and the Supreme Court's decision in Tabor. See also Young v. Colligan, 560 So.2d 843 (La.App. 3d Cir.), writ denied, 565 So.2d 452 (La.1990). Plaintiff's experts testified the standard of care in this case also included: (a) Properly evaluating and assessing Phillip; (b) following up his care and eventual placement; and (c) exploring other treatment options and facilities when immediate treatment could not be obtained at UMC. Although such testimony is not always controlling, the trial judge is not free to ignore or disregard it without sound reasons or a rational basis appearing in the record. See Pfiffner v. Correa, 94-924, 94-963, 94-992 (La.10/17/94); 643 So.2d 1228; Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713 (La.1986). At this stage proceedings, defendants have not offered contradicting expert evidence on this issue; and, plaintiff put forth substantial and sufficient evidence to meet her prima facia burden at the very least. Dr. Phillip Landry and Dr. David Legendre testified LADAC's failure, among other acts, to implement any follow-up system also constituted a breach of the expected standard of care. Dr. Landry testified as follows:
Q: All I'm asking you is I want you to assume that the testimony is that LADAC had no methodology for following up on such individuals and avowedly no duty to do so; that they say once they were on a waiting list somewhere, that was the end of their duty. Do you feel that violated the standard of care?
A: Yes, I do and if I might elaborate? My statements are made, taking the position *750 that if I'm faced with an individual who presents for mental health services, then that individual becomes my responsibility until a service is provided. Whether I am the one who will provide the service is inconsequential. It is still my responsibility to see to it that the individual is cared for. And certainly the lack of a system for communicating with the potential inpatient is in my opinion an accident waiting to happen.
Further, Joyce Ben (LADAC's director) admitted Simpson should have checked for alternate facilities when he learned UMC did not have space for Phillip. She testified:
Q: As a general proposition, do you feel that the screenerif that is the situation, if there are no beds available, do you feelin a detox situation, was it your procedure at LADAC to attempt to determine the availability of other facilities for detox?
A: Well, that's what they would do. For example, if UMC said there were no beds, then yes, the screener would look for an alternative place.
Q: And that's the proper procedure that your people were instructed to follow, correct?
A: Yes.
The trial judge, in his oral reasons for judgment, failed to mention the testimony of these witnesses. Instead, he opted to place 100% fault on plaintiff and her late husband for failing to "follow-up" his care.
For these reasons, I respectfully disagree with the majority's affirmance of the trial court's judgment granting defendants' motion for involuntary dismissal with prejudice.
NOTES
[*] Thibodeaux, J., recused.