617 So.2d 1267 (1993)
Joetta Polk PROVOST, Plaintiff-Appellant,
v.
John PROVOST, et al., Defendants-Appellees.
No. 92-961.
Court of Appeal of Louisiana, Third Circuit.
May 5, 1993.
*1269 Frank Lemoine, Abbeville, John Allen Jeansonne, Jr., Lafayette, for Joetta Polk Provost.
Lewis H. Pitman, Jr., New Iberia, John William Penny, Jr., Lafayette, for John Provost et al.
John Knox Hill Jr., David R. Rabalais, Lafayette, for Casualty Reciprocal Exchange.
Before LABORDE, THIBODEAUX and SAUNDERS, JJ.
SAUNDERS, Judge.
Plaintiff, Joetta Polk Provost, filed suit against the defendants, her ex-husband, John Provost, and his liability insurer, Casualty Reciprocal Exchange (Casualty), for damages resulting from an alleged battery upon the plaintiff by the defendant. After a four day trial, the jury returned its verdict on the jury interrogatory form provided by the court, as follows:
"1.
"What is the degree of fault or negligence, if any, of the defendant, which proximately caused the plaintiff's damages?
 ANSWER: 25%
If the above answer is "0," go no farther, your deliberations are ended.

*1270 2.
What is the degree of fault or negligence, if any, of the plaintiff, which proximately caused her own damages?
 ANSWER: 75%
3.
Did the defendant intend to inflict serious bodily injury on the plaintiff?
 YES ____ NO X 
4.
What is the total amount of damages, expressed in dollars, suffered by the plaintiff in this case, without making any reduction for her own negligence, if any?
 $80,000.00
New Iberia, Louisiana, this 2 day of April, 1992.
 s/MICHAEL POWELL
 JURY FOREPERSON"
The judgment signed by the trial court following this verdict was in favor of the plaintiff and against the defendants. Judgment was rendered accordingly. The trial judge also ordered the plaintiff to pay 75% of the costs of the action and assessed 25% of the costs to the defendants.
Plaintiff moved for a new trial which was denied. This appeal followed. Additionally, both defendants filed separate answers to the appeal.

FACTS
The plaintiff, Joetta Polk Provost, and the defendant, John W. Provost, were married on June 7, 1985. The couple lived together for about six months, then separated on December 24, 1985. They were divorced in March of 1987. Following the divorce, the parties continued to see each other periodically.
The testimony of both indicates that on the evening of August 25, 1989, the plaintiff, dressed in a nightgown and slippers, went to the home of the defendant, uninvited. She entered the house, unannounced, and found the defendant talking on the telephone. After learning that the defendant was talking to another woman, plaintiff flew into a rage of cursing and swearing. She had a small can of mace in her hand. Defendant ordered the plaintiff to leave his house, shoved her toward the door, grabbed her wrists and lead her to the door. Defendant testified that he grabbed her wrists to keep her from spraying the mace in his direction. At some point, the defendant pushed plaintiff "in the neck area." The plaintiff then kicked the defendant and when he released his grasp, she sprayed mace into his eyes. In response, he slapped the plaintiff on the head.
During the scuffle, plaintiff lost her car key and, in an effort to find it, she moved a washer and a dryer and found the key under the dryer. She then walked outside and proceeded to accelerate her car forward in a manner that drew the defendant outside. The defendant, thinking that the plaintiff was accelerating forward in an effort to push his car through the garage wall, jumped on the plaintiff's car and drove his fist through the passenger windshield. Plaintiff finally drove away. Defendant testified that plaintiff, on the way to her car, "keyed" his car, i.e., scratched the paint off alongside the car with the key.
Both parties contacted the police. An officer arrived at the defendant's home and inspected the driveway. He confirmed from the appearance of the gravel, etc., that the plaintiff was accelerating her car forward and that defendant's car had been moved some distance. No action was taken.
The plaintiff prepared a written statement to the police wherein she stated that the defendant "choked me as if he wanted to kill me." Plaintiff retracted this statement in her deposition, stating that she only made the statement to assure an arrest. At trial, plaintiff changed her mind again and testified that the defendant choked her and she believed he wanted to kill her.
Pursuant to plaintiff's complaint to the police, defendant was arrested and charged with simple battery and criminal damage to property. Upon the advice of counsel, defendant *1271 pled guilty and made restitution for the medicals incurred up to that time and the damage to plaintiff's car.
Plaintiff filed this lawsuit on August 8, 1990.

PLAINTIFF'S INJURIES
On August 26, 1989, the morning following the incident, the plaintiff visited her family physician, Dr. George Sagrera. In his deposition, Dr. Sagrera testified that his examination revealed a right occipital hematoma and a mid-posterior thoracic hematoma. He ordered a CT scan and an X-ray of her cervical spine. The results of the tests were normal. The doctor prescribed pain and anti-inflammatory medication.
Plaintiff began experiencing headaches for which she saw Dr. Leopaldo De Alvare, a neurologist, on December 7, 1989. He examined the plaintiff and prescribed medication. She visited Dr. De Alvare again on December 14, 1989.
Finding no relief from the medication given, plaintiff contacted her attorney who recommended his own orthopedic surgeon, Dr. Stuart Phillips, in New Orleans. Dr. Phillips was deposed and the following facts are gathered from that deposition.
Plaintiff visited Dr. Phillips on January 16, 1990, complaining of numbness and tingling in her right arm in addition to the headaches. Suspecting a disc problem, Dr. Phillips ordered a CT scan, diskogram, thermogram, and an MRI.
On plaintiff's March 8, 1990, visit, Dr. Phillips reviewed the results of her tests. The MRI and CT scan were normal. However, the results of the diskogram indicated a disc rupture upon prolapse of a lesion at the C4-5. He relied solely on the results of the diskogram study to determine that the discs should be operated on.
He performed an anterior fusion on March 30, 1990. On April 1, she was discharged free from pain. On her follow-up visit of May 17, 1990, her only complaint was trouble sleeping. Otherwise, she was feeling fine. Dr. Phillips put her on an exercise program and asked her to return to his office in six weeks.
Plaintiff returned to Dr. Phillips' office on June 7, 1990. During this visit, she complained of swelling in her legs. The plaintiff revealed that she had gone back to work as a car salesperson and the job involved standing on concrete for long periods of time. Suspecting thrombophlebitis, i.e., a blood clot, was forming, Dr. Phillips prescribed bed rest and Naprosyn, an anti-inflammatory agent, and asked the plaintiff to return in two weeks. He did not order a venogram to determine if thrombophlebitis was present. His testimony indicates that this is a common complication of surgery and since the swelling occurred within twelve weeks of surgery, more than likely it was an incident of the surgery.
Plaintiff returned to Dr. Phillips on August 14, 1990. At that time, the swelling in her legs had been reduced and Dr. Phillips told her that she could try to go back to work. On plaintiff's visit of November 13, 1990, she complained of muscle spasms and pain on extreme motion of her neck. On plaintiff's visit of February 19, 1991, she informed Dr. Phillips that she was being treated by a dentist for Temporal-mandibular joint pain (TMJ). On plaintiff's next visit of June 21, 1991, plaintiff's TMJ was under control, however, she was still complaining of neck pain with activities. Dr. Phillips recommended that the plaintiff increase her activity, use heat on her neck, and exercise. Plaintiff returned to Dr. Phillips on December 5, 1991, still complaining of pain and that she could not move to the left. She was pregnant at this time and about to deliver, so Dr. Phillips did not do any re-imaging of her musculoskeleton. Her last visit before trial was on March 17, 1992, wherein she was complaining of weakness in her right arm and some mild spasms. Dr. Phillips took X-rays and found the fusion solid. It was his opinion that the results of the surgery were "good, but not excellent."
Defendants presented the testimony of Dr. Leopaldo De Alvare, the neurologist who had seen the plaintiff twice in December of 1989, on December 7 and December *1272 14, prior to her consultations which Dr. Phillips. Based upon his examinations, Dr. De Alvare found no evidence of cervical problems.
Dr. De Alvare also testified that he felt that the plaintiff had some functional overlays (emotional problems) and believed that there was some element of exaggeration in her examination. Although he did believe she had the headaches, he testified that the location of the plaintiff's headaches were not consistent with the kind of headaches "that you get because you've got ruptured disks or messed up soft tissues in the neck." It was his opinion that the headaches were "muscle contraction headaches, tension headaches, and that they were directly related to emotional distress."
On her first visit with Dr. De Alvare, he told the plaintiff that he did not think she had a serious physical injury. On her second and last visit, plaintiff told Dr. De Alvare that she was doing very well. She reported compliance with the medication and a decrease in her symptoms and, essentially, a feeling of well-being at that time. The plaintiff was scheduled to return in January of 1990, but rescheduled this appointment and did not keep the rescheduled appointment.
At the defendant's request, Dr. De Alvare also reviewed the discograph and MRI films taken in March of 1990. He disputes the findings of Dr. Phillips and testified as follows:
"On the films I thought that on the MRI there was a very minimal problem at 4-5, a very minimal mid-lien [sic] bulge. The diskograms I didn't think showed any abnormality at all. I really don't believe in the subjective component of the diskogram. I didn't feel that this lady was at all a surgical candidate nor that she had a significant problem with her spine."
Defendants also presented the testimony of Dr. Gregory Gidman, an orthopedic surgeon, who examined plaintiff on February 25, 1992. At that time, her chief complaints were of neck pain, right shoulder and arm pain, numbness and pains in her right hand. She had a normal neurological examination. Dr. Gidman reviewed the film studies and concluded that the MRI indicated a small bulge at C4-5 which he did not think was a pathologic finding, since most small bulges are normal findings.
It was also Dr. Gidman's opinion that the discography was not a very reliable study. He concurred with Dr. De Alvare's conclusion that the plaintiff did not need surgery as revealed by the following testimony:
"Q. What I want to do is back up, though. In December of '89, I want you to assume that you examined her on two occasions in December of '89 just as Dr. De Alvare did; and I want you to assume that when you examined her in December of '89, she had a completely normal cervical exam in all aspects that you can think of.
"Would that coupled with the findings you saw on the studies you reviewed also lead you to believe that prior to the time you saw her and prior to the time that she walked into your office that, in your opinion, she did not need to have a two-level cervical fusion at the time she did?
"A. Normal exam and these x-raysI would not operate on her."
The plaintiff went back to work as a car salesperson with J.P. Thibodeaux Olds in September of 1990 and remained until May of 1991. She testified that she quit working for J.P. Thibodeaux because she had married a co-employee and it was against policy to employ married co-workers. Afterwards, plaintiff went to work with Musson-Patout and quit working there due to gynecological problems, which were totally unrelated to the August 25, 1989, incident.

PLAINTIFF'S APPEAL
Plaintiff presents the following issues for our review:
"1. Whether the Jury abused its discretion in awarding Ms. Polk only $80,000 in damages for the concussion, two level cervical fusion, phlebitis and TMJ syndrome which resulted from the altercation.
2. Whether the Trial Judge committed error in refusing to charge the Jury *1273 that the defendants are liable for any aggravation of Ms. Polk's condition which resulted from the treatment of her physicians.
3. Whether the Jury abused its discretion in assessing the plaintiff with 75% contributory fault."

Issue No. 1Quantum:
Plaintiff contends that the jury's award of damages was inadequate when considering the plaintiff sustained a concussion, two fused cervical discs, phlebitis, and a TMJ syndrome.
LSA-C.C. art. 2324.1 provides:
"In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury."
Our standard of review as to damages was succinctly set forth in Jaffarzad v. Jones Truck Lines, Inc., 561 So.2d 144, 153 (La.App. 3d Cir.), writ denied, 565 So.2d 450 (La.1990), as follows:
"Before this court can disturb an award made by the trial court, the record must clearly reveal that the trier of fact abused its discretion in making its award. Perniciaro v. Brinch, 384 So.2d 392 (La.1980); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Wattigny v. Breaux, 488 So.2d 419 (La.App. 3 Cir.1986). In reviewing an award of damages to determine whether it is inadequate or excessive, the appellate court must first look to the individual circumstances of the case before it. Broussard v. Peltier, 479 So.2d 679 (La.App. 3 Cir. 1985). Only after an analysis of the facts reveals an abuse of discretion can the appellate court disturb the award, then only to raise inadequate awards to the lowest amount the trial court could have reasonably awarded, or lower excessive awards to the highest amount the trial court could have reasonably awarded. Reck v. Stevens, 373 So.2d 498 (La. 1979); Coco, supra; Clark v. State Farm Ins. Co., 520 So.2d 860 (La.App. 3 Cir.1987); Freeman v. Harold Dickey Transport, Inc., 467 So.2d 194 (La.App. 3 Cir.1985)."
Evaluation of a personal injury award is extremely difficult. The demeanor of the witness, the believability of the injured party's experience, and the medical evidence presented are the essentials in a juror's resolution of quantum. Roy v. Commercial Union Ins. Co., 486 So.2d 251 (La.App. 3d Cir.1986).
Mindful of these principles, we will address each claim individually and discuss the relevant evidence.

A. Concussion:
Plaintiff's only evidence suggesting that she had suffered from a concussion was a statement from Dr. Sagrera elicited in his deposition that, in retrospect, he thinks she was concussed. The plaintiff testified that she had not lost consciousness.

B. Two-Level Cervical Fusion:
In her brief, plaintiff contends that the jury erred in not awarding her $150,000.00 in general damages for the cervical fusion performed by Dr. Phillips. Plaintiff requests that we examine prior jurisprudence for similar injuries. However, prior awards are only an aid where the present award is shown to be greatly disproportionate to past awards for truly similar injuries. Toups v. T.G. & Y. Stores Co., 488 So.2d 296 (La.App. 3d Cir.1986). Although it is impossible for us to judge what evidence was given special weight by the jury, we note the conflicting medical opinions. The testimony of both Dr. De Alvare and Dr. Gidman, as well as the fact that she resumed working, painted a different medical picture than the one painted by plaintiff's evidence.

C. Phlebitis:
Although there was testimony from Dr. Phillips regarding the fact that the plaintiff's legs were swollen, which indicated possible thrombophlebitis, no diagnostic tests, i.e., venogram, were ever conducted to confirm this condition. Furthermore, according to Dr. De Alvare's testimony, it is unusual for both legs to be swollen, which indicated something other than thrombophlebitis, *1274 i.e., standing for long periods of time, fluid retention, or arthritis. Additionally, according to Dr. De Alvare, Naprosyn is not the proper medication for thrombophlebitis. Naprosyn is an anti-inflammatory drug, not an anti-coagulant which is the treatment for thrombophlebitis. Finally, the plaintiff recovered from the swelling within a short period of time.

D. TMJ:
Plaintiff was diagnosed with TMJ on January 22, 1991. Dr. Antime Landry, plaintiff's orthodontist, testified at trial and related the condition to the incident solely based on the history that the plaintiff provided to him. However, on cross-examination, it was revealed that the plaintiff had a malocclusion (overbite) which alone can cause TMJ problems. In fact, according to her patient summary sheet, the plaintiff initially visited Dr. Landry for cosmetic reasons, i.e., to repair the overbite.

E. Medical Bills:
Plaintiff introduced evidence of medical bills totaling $19,465.56. Because the jury's award was a lump sum award of $80,000.00, (subject to a reduction according to the allocation of 75% fault to the plaintiff), we cannot ascertain exactly how the jury arrived at this figure. We have reviewed the jury instructions to determine if the judge instructed the jury as to what the damage award consists of, including the proven medicals. The judge instructed the jury as follows:
"Now, Ms. Polk is claiming damages as a result of the accident. The amounts claimed or argued by the lawyers are not evidence but merely something for you to consider in this case.
As I told you earlier, Louisiana damages must be reasonable. If you find that Ms. Polk is entitled to an award, you may award her only such that will compensate her for such injury and damage that you find she actually sustained or may sustain in the future. You are not permitted to award speculative damagesthat is, damages which are remote or conjecturalnor can you award punitive damages or exemplary damages to punish somebody.
What you award, if any, should include the reasonable value of any examinations; care; treatment given by physicians, nurses or others; ambulance services; medicines, drugs, surgical or hospital expenses that she may have sustained or may reasonably be required to sustain in the future. You should determine what sum would be equal to any pain and suffering that Ms. Polk may have suffered in the past, present or future; any mental anguish; any past loss of earnings or any future loss of earnings and earning impairment that she may reasonably be certain to sustain in the future; and any physical, permanent impairment or disability from such injuries.
All damages must be proven by a preponderance of the evidence."
Therefore, we must assume that all of these elements, as instructed, were properly taken into account by the jury in reaching its verdict as to the award. A lump sum judgment of damages is presumed to award all items of damages claimed. Taylor v. Dupree, 484 So.2d 986 (La.App. 3d Cir.), writ denied, 488 So.2d 201 (La.1986).

F. Wage Loss:
Plaintiff introduced the testimony of a vocational rehabilitationist and an economist, regarding the issue of lost wages. The defendants did not introduce a vocational rehabilitationist or an economist to provide contradictory evidence. In evaluating evidence, the trier of fact should accept as true the uncontradicted testimony of a plaintiff witness, absent a sound reason for its rejection. Johnson v. Ins. Co. of N. America, 454 So.2d 1113 (La. 1984). Apparently, the jury considered the fact that the plaintiff testified that she had returned to work at Louisiana Motors until March, 1990, the month she had surgery. Plaintiff testified that she worked for J.P. Thibodeaux beginning in September, 1990, until May of 1991. She testified that the sole reason she terminated her employment *1275 with J.P. Thibodeaux was the fact that she married a co-worker. Thereafter, plaintiff worked at Musson-Patout during the month of May, 1991, and terminated this employment due to a pregnancy and other unrelated gynecological problems. Therefore, it would be reasonable to conclude that the plaintiff could return to her former occupation as a car salesperson. We have carefully reviewed the evidence and cannot say that the evidence points to an abuse of the jury's discretion in its award of $80,000.00.

Issue No. 2Jury Instructions:
Plaintiff contends that the trial judge erred in failing to give a certain instruction to the jury. Plaintiff submitted the following charge to the trial judge:
"A tortfeasor takes his victim as he finds him, and is responsible in damages for consequences of his tort although damages so caused are greater because of a prior condition which may be aggravated. A tortfeasor takes his victim as he finds him and is responsible for all the natural and probable consequences of his tortious conduct when defendant's negligence aggravates or activates a pre-existing condition, he must compensate the victim for the full extent of the aggravation. A tortfeasor is responsible for aggravation of injuries caused by the treatment of physicians." (Citations omitted.)
The trial judge declined to include this instruction in his charge to the jury and plaintiff objected to his refusal to do so. It is plaintiff's contention that had this instruction been given, it may have played an important part in mitigating any effect which the defendant's, Casualty Reciprocal Exchange, attack upon the integrity of Dr. Phillips may have produced in the minds of the jurors. In other words, the jury would have awarded more than $80,000.00 had the instruction been given. Plaintiff's argument, as excerpted from her brief, is as follows:
"The instruction requested by the plaintiff is clearly the law, and has been the law in this jurisdiction for many years. The instruction requested by the plaintiff was therefore accurate. That instruction was also material to the case at hand. Had it been given by the trial court, it may have played an important part in mitigating any effect which CRE's attacks upon the integrity of Dr. Phillips may have produced in the minds of the jurors.
Those attacks almost certainly played an important part in that body's deliberations. It is difficult to explain the extremely low award of damages which was made to Ms. Polk without assuming that the jury believed that the surgical procedure which was afforded to her was not necessary.
As the plaintiff has said, she is of the opinion that Dr. Phillips' surgery was both necessary and beneficial. If, however, the trial court had properly instructed the jury, Ms. Polk's need for a two-level fusion would not have been relevant. The members of the jury would have been made to understand that the defendants are liable for disability resulting from the surgery, whether it was necessary or not. The Trial Court's erroneous failure to give the instruction requested by the plaintiff deprived the jury of this crucial information, and was more likely than not the direct cause of the extremely low award which was made by its members."
The trial judge need only give those instructions which fairly and reasonably point to the issues and which provide correct principles of law for the jury to apply to those issues. Sparacello v. Andrews, 501 So.2d 269 (La.App. 1st Cir.1986), writ denied, 502 So.2d 103 (La.1987). As stated in Sparacello:
In a jury trial, the judge is not required to give the precise instructions submitted by either party, but must give instructions which properly reflect the law applicable in light of the facts of the particular case. Beck v. Lovell, 361 So.2d 245 (La.App. 1st Cir.1978), writ denied, 362 So.2d 802 (La.1978). Adequate instructions are those instructions which fairly and reasonably point up the issues presented by the pleadings and *1276 evidence and which provide correct principles of law for the jury's application thereto. Davidson v. Peden, 413 So.2d 568 (La.App. 1st Cir.1982).
The judge has a duty to charge the jury as to the law applicable in a case and the correlative right and responsibility to require that the jury get only the correct law. It is the judge's responsibility to reduce the possibility of confusing the jury, and he may exercise the right to decide what law is applicable to prevent counsel from arguing law which the trial judge deems inappropriate. Arnouville v. Joiner Enterprises, Inc., 423 So.2d 1246 (La.App. 5th Cir.1982), writ denied, 430 So.2d 76 (La.1983).
501 So.2d at 277.
We fail to follow the logic of plaintiff's argument. From our view of the evidence, the point of the testimony discounting Dr. Phillips could not possibly have been to focus on Dr. Phillips' integrity, but to prove the extent of the damage sustained by the plaintiff prior to the surgery. This argument, in effect, merely offers us a "back door" through which to review once again the claim of inadequate damages.
After carefully reviewing the trial judge's instructions and the requested jury instruction in light of the facts and pleadings in this case, we find that the instructions as given by the trial judge were adequate and fairly instructed to the jury. The substance of plaintiff's requested instruction was given in the charge as a whole, and the refusal to give the requested instruction was not reversible error. The jury was free to consider all of the evidence before it, make its own observations of the witnesses, and interpret what it heard and observed in accordance with its best judgment. When the findings are based on determinations regarding the credibility of witnesses, the "manifest errorclearly wrong" standard demands great deference to the findings of the trier of fact. Rosell v. ESCO, 549 So.2d 840 (La.1989). In a situation where the fact finder's decision is based on crediting the testimony of one of two or more witnesses, this finding can almost never be found to be manifestly erroneous. Rosell, id.

Issue No. 3Allocation of Fault:
Plaintiff contends the jury's assignment of fault was contrary to the evidence and testimony adduced at trial. At the outset, we note that a trier's finding as to degree of fault under LSA-C.C. art. 2323 is a factual matter and should not be disturbed on appeal unless the record establishes that the finding was clearly wrong or an abuse of discretion. Courmier v. Travelers Ins. Co., 486 So.2d 243 (La.App. 3d Cir.1986), writ denied, 489 So.2d 250, 251 (La.1986). In apportioning fault, the trier of fact must consider both the nature of conduct of each party at fault and the extent of the causal connection between the conduct and damages. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985). A party who relies upon contributory negligence as a defense bears the burden of proving by a preponderance of the evidence that such negligence was a cause in fact of the accident. Smith v. Travelers Ins. Co., 430 So.2d 55 (La.1983).
With these legal principles in mind, we have reviewed the pertinent evidence adduced at trial and find that this evidence is sufficient to support the application of comparative fault to reduce the plaintiff's recovery. Plaintiff showed up at the defendant's home uninvited, entered his home unannounced, and instigated a shouting match which eventually led the defendant to grab the plaintiff to remove her from his home. She then kicked him and sprayed mace in his face. He retaliated with two slaps to plaintiff's head. We find the allocation of 75% fault to the plaintiff was within the jury's discretion.

JOHN PROVOST'S APPEAL
Defendant, John Provost, answered the appeal requesting that we modify/reverse the jury's allocation of fault. Based upon the aforesaid principles of law with regard to comparative fault, we find no error in the jury's allocation of fault to the defendant at 25%.
*1277 Secondly, defendant, Provost, objects to the award of $80,000.00. Based upon the aforesaid principles of law with regard to damages, we find no error in the jury's verdict.
Accordingly, the answer to the appeal is denied.

CASUALTY'S APPEAL
Defendant, Casualty, answered the appeal, asserting that the jury's verdict was improper in finding defendant, John Provost, liable to the plaintiff and also in error on the issue of coverage.
Casualty issued a policy of homeowner's liability insurance to John Provost. Under this policy of insurance, Casualty's obligation is set forth as follows:
"COVERAGE EPersonal Liability
If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, we will:
1. Pay up to our limits of liability for the damages for which the insured is legally liable; and
2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the occurrence equals our limit of liability."
Casualty denies coverage based upon the intentional act exclusion of the policy which states:
"SECTION IIExclusion
1. Coverage EPersonal Liability and Coverage FMedical Payments To Others do not apply to bodily injury or property damage:
a. Which is expected or intended by the insured;"
In 1989, the Louisiana Supreme Court in Breland v. Schilling, 550 So.2d 609 (La. 1989), set the standard by which an intentional exclusion in a homeowner's policy would still provide coverage to the insured. The exclusion clause in the Breland case is very similar to the one in this policy. As in the Breland case, the present case involves an injury as a result of an altercation where blows were exchanged. Although the present case, unlike Breland, involves the spraying of mace by the plaintiff into the defendant's eyes which reflects that Mr. Provost's acts may not have been intentional, the evidence clearly establishes that defendant did not intend to injure the plaintiff to the extent that she was injured. The jury specifically answered in the negative on the question of intent on the verdict form.
In Breland, at page 614, the Court states:
"... when minor bodily injury is intended, and such results, the injury is barred from coverage. When serious bodily injury is intended, and such results, the injury is also barred from coverage. When a severe injury of a given sort is intended, and a severe injury of any sort occurs, then coverage is also barred. But when minor injury is intended, and a substantially greater or more severe injury results, whether by chance, coincidence, accident, or whatever, coverage for the more severe injury is not barred."
Therefore, coverage exists for the damages resulting from the altercation between the plaintiff and the defendant. See also Baugh v. Redmond, 565 So.2d 953 (La.App. 2d Cir.1990) for a complete and concise explanation of when coverage attaches.
We deny the relief requested by Casualty's answer.
Accordingly, for the foregoing reasons, we affirm the judgment of the trial court. Costs of this appeal are assessed one-third to each party.
AFFIRMED.