676 So.2d 839 (1996)
Deborah FLEMING, Plaintiff-Appellant,
v.
HCA HEALTH SERVICES OF LOUISIANA, INC., d/b/a Cypress Hospital, Defendant-Appellee.
Saundra FLEMING and Sharon Fleming, Plaintiffs-Appellants,
v.
HCA HEALTH SERVICES OF LOUISIANA, INC., d/b/a Cypress Hospital, Defendant-Appellee.
Nos. 95-1275, 95-1276.
Court of Appeal of Louisiana, Third Circuit.
July 3, 1996.
*841 Michael Benny Miller, Crowley, for Deborah Fleming.
Donald S. Zuber, Baton Rouge, for HCA Health Services of La. Inc. dba etc.
*842 Before KNOLL, THIBODEAUX, SAUNDERS, WOODARD, and AMY, JJ.
WOODARD, Judge.
In these consolidated cases, the plaintiffs have filed a civil suit against the defendant following the apparent suicide of King Fleming, the husband of Deborah and the father of Saundra and Sharon. The jury absolved the defendant of any liability, and the plaintiffs have appealed the verdict. We reverse.

FACTS
Sometime during the day on February 15, 1989, King Fleming went to the emergency room at St. Patrick's Hospital of Lake Charles, where he was living, but left before being seen. Sometime that day also, he telephoned his close friend in Lafayette, Ellis Guillbeau, and asked him to drive to Lake Charles, pick him up, and bring him to Cypress Hospital in Lafayette. Guillbeau agreed, and Guillbeau's wife called Deborah Fleming, King's wife who was living and working in Lafayette, and told her of the proposed course of action. Deborah contacted Cypress.
At this point, Deborah and Cypress diverge on what transpired between them. Deborah testified that she requested of Nurse Sally Braman that Cypress provide emergency services to King, including assessment and diagnosis. Nurse Braman maintained that Deborah merely wanted a referral to a facility that would admit and treat someone (King) who had no insurance, money, or job. She denied that Deborah had asked that Cypress "assess" King Fleming or to otherwise provide emergency treatment or care to him.
Deborah, here, flatly contradicts Nurse Braman. She insists that she spoke with Nurse Braman three times, twice over the phone and once in person, and each time she spoke with Nurse Braman, she stressed to her that King was already en route from Lake Charles, was suicidal and needed help, and each time she requested that Cypress assess King. Notwithstanding, each and every time her request for assessment and for, what amounted to, emergency treatment was denied. Instead, Nurse Braman referred Deborah, first, to Acadiana Mental Health Center; however, when she telephoned Acadiana, she was told that they had no vacancy. She called Nurse Braman back and informed her of what Acadiana had told her, again asked for an assessment, and again was turned down. Deborah then went to Cypress in person, where she reiterated to Nurse Braman that she was concerned that King was suicidal, that he was on his way to Cypress, and that he was desperately in need of immediate care and assessment. This time, Braman directed her to the University Medical Center (UMC), a public hospital in Lafayette. When King and Guillbeau arrived at Cypress in Lafayette, Deborah was waiting for them in the parking lot. Deborah testified that King got out of the truck before she could stop him, and she had to stop him from pushing past her. She said she had to convince him that Cypress would not take him. He would not believe it. Ellis Guilbeau testified to same and said they had a hard time getting him back in the truck. Ultimately, the three proceeded to UMC, as Braman had advised.
While waiting his turn to be seen there, King became increasingly annoyed and agitated. After waiting about an hour and before he could be assessed, he left. Guillbeau and Deborah frantically searched for him, to no avail. A few hours later, a little after 1:00 a.m., on February 16, 1989, King apparently jumped from an overpass outside of Lafayette onto Interstate 10, one driver describing him lying there with his leg propped up, waving, just before an 18-wheeler ran over him and killed him. His eye glasses were later found, folded, on the concrete rail of the overpass above.
Deborah Fleming, for herself and on behalf of King, and Saundra and Sharon Fleming, as King's children, filed separate suits against Cypress Hospital's legal entity, HCA Health Services of Louisiana, Inc., alleging that the defendant breached its statutory duty to render emergency service to King Fleming and that this breach led to his death. The separate suits were consolidated for trial, and the jury returned a verdict, *843 finding that Cypress was not "at fault for failing to examine or assess King Fleming."
We reverse.

LAW
Plaintiffs contend that the jury erred in failing to find that Cypress Hospital violated its statutory duty it owed to King Fleming and that the trial judge erred in its instructions to the jury.
The dispositive issue in this case is whether Cypress breached a duty it owed to render King Fleming, a person in need of emergency services, access to diagnosis by a licensed physician because he was unable to establish his ability to pay for those services, which is prohibited under La.R.S. 40:2113.6. We find that, indeed, Cypress did breach its duty under this statute. We find this to be so, whether under a de novo review, after finding that the lower court erred as a matter of law, or under a manifest error-clearly wrong standard of appellate review.

ERROR AS A MATTER OF LAW
A jury's answer to an interrogatory is governed by the manifest error-clearly wrong standard of appellate review unless the interrogatory was so inadequate or incorrect as to preclude the jury from reaching a verdict based on the law and the facts. Doyle v. Picadilly Cafeterias, 576 So.2d 1143 (La.App. 3 Cir.1991). If the trial court submits a verdict form to the jury with misleading or confusing interrogatories, just as when it omits to instruct the jury on an applicable essential legal principle, such interrogatories do not adequately set forth the issues to be decided by the jury and may constitute reversible error. Id. We find that to be so in the case sub judice.
The jury in this case was required to answer only one question to reach its verdict: "Do you find Cypress Hospital at fault in failing to examine or assess King Fleming?" (Emphasis added.) The jury was instructed that if it answered this question "no," it was to proceed no further. It did answer it "no" and that answer became its verdict. We suggest that a more appropriate interrogatory, harmonious with the statutory mandate, would have been: "Do you find that Cypress Hospital breached its duty under the statute, which reads...." We find that the interrogatory asked, along with the jury instructions, conveyed an impression of the law that misled and confused the jury.
The relevant language of 40:2113.6 is as follows:
A. (1) No officer, employer, or member of the medical staff of a hospital licensed by the Department of Health and Human Resources shall deny emergency services available at the hospital to a person diagnosed by a licensed physician as requiring emergency services because the person is unable to establish his ability to pay for the services....
B. No officer, employee, or member of the medical staff ... shall deny a person in need of emergency services access to diagnosis by a licensed physician on the staff of the hospital because the person is unable to establish his ability to pay for the services....
C. `Emergency services' means services that are usually and customarily available at the respective hospital and that must be provided immediately to stabilize a medical condition which, if not stabilized, could reasonably be expected to result in the loss of the person's life.... [Emphasis added.]
Nothing in the text of this statute premises the finding of a violation of the statute upon a determination that the hospital or its agents were "at fault," whatever that may mean in this context; yet, the verdict interrogatory, as quoted above, plainly made it so. We conclude that this is error as a matter of law and constitutes reversible error.
A judge has a duty to charge the jury as to law applicable in the case, and the correlative right and responsibility to require that the jury gets only the correct law. Provost v. Provost, 617 So.2d 1267 (La.App. 3 Cir.1993). In his instructions to the jury, the judge read the language of La.R.S. 40:2113.6, connoting a specific and compulsory duty, then succeeded it with the following general language which implies discretion:
Louisiana law further provides that a hospital is not an insurer of a person's *844 safety, and the rules as to the care required are limited by the rules that no one is required to guard against or take measures to avert that which a reasonable person under the circumstances would not anticipate is likely to happen. The hospital is obligated to use reasonable care in light of the requirement of a person's circumstances. [Emphasis supplied.]
The two standards, mandatory and discretionary, are incongruous. Both cannot be applied. The jury had to choose and could have very well have chosen the latter.
These errors struck at the heart of the issue to be decided. The misleading jury instruction and the defective verdict interrogatory, separate or in conjunction, confused the very issue to be decided, and, in doing so, vitiated the jury's ultimate finding, since in this case the specific interrogatory had the effect of an ultimate disposition. Further, we find that the defective verdict interrogatory, reinforced by the defective jury instruction, which explicitly grafted the requirement of a finding of fault in order to determine that the statute had been violated, conveyed that a violation of the statute required the added finding that the violation occurred through the fault of the violator. Thus, considered as a whole, the jury instructions, which were made manifest in the verdict interrogatory, were incorrect and inadequate in enunciating the principles of law for the jury to apply in this case. When an erroneous instruction or verdict interrogatory probably contributes to the verdict, this court must make an independent determination from the record without according any weight whatsoever to the factual findings of the erroneously instructed jury [Picou v. Ferrara, 483 So.2d 915 (La.1986)], which we will do below.

DID CYPRESS VIOLATE STATUTE?
We initially note that defense counsel seeks to have us apply a similar federal law, 42 USCA 1395, entitled EMTALA, instead of our state statute directly on point. Notwithstanding, we find that EMTALA is not applicable to this analysis, as it does not preempt La.R.S. 40:2113. In fact, 42 USCA 1395 specifically states that it does not preempt state law, except to the extent that the requirements of the state law directly conflict with the requirements of that federal law. We found no Louisiana cases on this point. However, our review of similar issues in other states convinces us that our state statute does not conflict with EMTALA, as it in no way undermines the purpose or intent of, nor restricts or eliminates rights provided by EMTALA, the obvious purpose of which is to provide all Americans with health care in emergency situations. Thus, the state statute is applicable.
In applying La.R.S. 40:2113.6 to the instant case, the record establishes that Cypress violated its duty. Cypress is a hospital that provides emergency services and has a licensed physician to assess and diagnose persons in need of those services. The record shows that King Fleming was in need of those services. References to his bizarre behavior are abundant. Nurse Braman admits that Deborah informed her that she thought King was a potential suicide victim. She also knew that Deborah was trying to find a facility which would see him, that Deborah was having a difficult time finding one, that she was very upset, and that Cypress was King's choice. On the same day, Deborah made two calls to Nurse Braman and even went to the hospital and spoke with her in person around 8:30 p.m., seeking help for her husband. Whether you believe Nurse Braman, that Deborah never specifically asked for Cypress to assess him but instead simply wanted to know who would, since he had no money or insurance, one must ask, with Braman's knowledge of King's need, Deborah's difficulty, and Cypress' advertisements, which are undisguised, open-ended solicitations offering to the public free assessments, why did Braman not simply say, "We do that, bring him in," especially when Deborah went to Cypress and advised her that he was on his way to Cypress and would be on the premises soon. After all, King Fleming's medical needs seem to ideally fit the patient needs profile in Cypress' advertisements, which claim to provide to the public "All The Care You Need," including: "adult psychiatric program," "psychiatric intensive care unit," "24-hour admissions," *845 and a "suicide crisis line." (Emphasis added.) Its ad ends with the exhortation: "Please Call for Free Assessment." (Emphasis added.)
King Fleming believed he was in need of the advertised care, which Cypress advertised it would provide for free. Nevertheless, King was turned away. The reason was money, despite Cypress' avowals to the contrary. In fact, a review especially of the testimonies of Deborah, Nurse Braman, Dr. Charles St. Romain, and John Reedy, the hospital administrator, make it distressingly clear that Cypress' actual practice, if not its promulgated policy, was to ignore or evade its duty under the statute, if it could. To wit, an excerpt from Reedy's testimony at trial:
Q When we first started talking about someone calling, we had somebody that was calling you and saying their husband is suicidal
A Uh huh.
Q that he needed help, and that they don't have any money.
A Uh huh.
Q Okay. You've indicated that you would think it would be better for them to go to a different facility because of certain reasons?
A Time mostly, yes, sir.
Q All right. In the second case we have a person calling and saying my husband is suicidal, he needs help, and I have insurance. In that case, you've told me that Cypress will take and assess that person.
A That's correct.
Q So the only difference in the two scenarios is in the first one they didn't have funds and in the second one they had insurance, which would be funds?
A Yes, sir.

Q And you've also said that Cypress did offer free assessments?

A Yes, sir.

Q But when they called and asked for an assessment and they didn't have funds, then what was done is you would try and refer them to another facility to facilitate them; is that correct?
A To facilitate them, yes, sir. [Emphasis added.]
This is precisely what Nurse Braman did with King Flemingfollow policy. Although she justifies her decision by essentially claiming that Deborah did not specifically ask for emergency service or assessment and diagnosis, so she, Braman, did not feel that Cypress was obligated to offer or provide them, this is in direct contravention of the plain wording of the statute. No where does the statute predicate the duty on being "asked," but rather on being presented with a situation of someone in need of emergency services, which was glaringly the case here, and which is not really contested by Cypress.
Cypress simply seems to either believe that its statutory duty is not activated unless someone says the precise "magic words" or that it has the discretion to not comply with the directive of the statute. However, we believe that the statute clearly imposes an affirmative, mandatory duty on hospitals, not one it can choose to fulfill at its inclination. Cypress knew, or should have known, that it was being presented with an emergency situation, and it knew or should have known that it was being requested to provide services, as required under statute, services which, furthermore, it had promised to provide in advertisements to the public. Cypress' violation was especially egregious because this violation did not represent an isolated incident but rather an established policya policy purposefully engineered to keep out those without an ability to pay, with no regard for their condition and whether they lived or dieda policy which is a per se violation of La.R.S. 40:2113.6a policy which, in fact, did cost a man his life.
Further, counsel for defendant argues that the statute does not apply unless the person needing assistance walks through the hospital door and asks for it. The case which the defendant cites as authority does not so hold, nor does our statute require it. While the ideal or preferred way may be for the patient to speak for himself, it is not the only way, and it is not always realistic. Common sense and a wealth of common experience tell us that it is not unusual for injured persons to *846 be accompanied and "represented" by family members, loved ones, or friends, especially when they are as distraught as King was. Many times they are even unconscious and unable to think or speak for themselves. Additionally, we do not find it necessary that King would have had to walk through the door. There is no dispute that his "representative"his wifedid walk through the door and was told that Cypress would not see her husband, who was on the premises when this message was conveyed to him. Cypress either knew this, or could have verified it if it would have made the slightest effort, and if, indeed, it had mattered. Further, going inside would have obviously served no purpose, would have indeed been futileespecially, as we know now, in light of Cypress' policy and actual practice. King Fleming was in an emotional breakdown, exhibiting irrational behaviorunable to think rationally. He did as much as any person in his position could be expected to do.
Cypress cites Miller v. Medical Center of Southwest Louisiana, 93-5123 (5th Cir.1994), 22 F.3d 626, for the proposition that because King never actually entered the doors of Cypress, and because Deborah could not act on his behalf, Cypress' duty under the Emergency Medical Treatment and Active Labor Act (42 U.S.C. 1395dd) would not have been triggered and, by extension, its duty under Louisiana statute. Miller holds no such thing. We find that this case is not applicable to the instant case for a number of reasons; the most important being that the plaintiff in Miller sued requesting relief specifically under EMTALA. Thus, his case was analyzed under that statute, and there is nothing in its holding that directs us to apply EMTALA, as opposed to our state statute. Further, as previously discussed, we find the state statute to be controlling in the case sub judice. Finally, even if we were to consider that EMTALA should apply to the instant case, which we believe to be improper, we would still conclude that this plaintiff, under these facts, is entitled to relief. First, as a fact, unlike King, the potential patient in Miller never came within miles of the hospital. Second, as a fact, the patient's treating physician made the request to the hospital when the patient was in his office miles away from the hospital, and the hospital informed the doctor not to send the patient to the hospital before the patient even began his journey. Miller clearly does not resolve whether a patient must physically enter the emergency department. In fact, it notes cases from other jurisdictions which have held that physical presence in the emergency department is not required, that going to the hospital is sufficient:
We do not face the issue that those courts faced and we make no comment on the soundness of those decisions. However, we do note that while the plaintiffs in [cases cited] did not enter the emergency department, they did reach the hospital and the emergencies did occur at a participating hospital. This is very different from someone who never came within thirty miles of the building and, in fact, never even began the journey there. [Emphasis added.]
Id. at 629. King Fleming did in fact reach the hospital, and, in any case, it would have been a vain and useless act for him to go any further. Moreover, the federal statute and the facts of Miller clearly allow for someone to make the request for treatment on the patient's behalf. Id.
Counsel also raises the question of whether King actually committed suicide, presumably implying that if he did not or if plaintiffs cannot prove that he did, Cypress escapes liability under the statute. We find this irrelevant to the issue of Cypress' duty. At the time Deborah made contact with Cypress, Braman was aware that King was potentially suicidal and that he was exhibiting irrational behavior. That, at the very least, should have triggered access to a diagnosis. Whether he died because of suicide or because of his irrational behavior which put him in a precarious situation resulting in his death, such as lying in the passing lane of an interstate at night, Cypress' duty to assess remains intact.
Defense counsel also attempts to read several issues into the statute for which we can find no support. For example, counsel argues that: Cypress is released of its express statutory responsibility because of Fleming's *847 attempt to consult with other hospitals, and because he was a resident of Lake Charles and not of Lafayette, Cypress did not have to see him. Initially, even if it could be argued that other hospitals may have ALSO breached their duty (although there is nothing in the record to so substantiate and neither party chose to make any other hospital part of this litigation), the statute still imposes an independent duty on Cypress which is not diminished by another's failure to comply, if that be the case. Regarding the residency argument, we find no mention in the statute of geographical restrictions on the person seeking emergency treatment. Indeed, what if someone visiting Lafayette had a heart attack while there, could not pay for care, and sought help at a Lafayette hospital; the statute would not apply and the hospital would not have to provide the person access to a diagnosis because the person lived in Lake Charles? Not based on La.R.S. 40:2113.6. This statute is straightforward, simple, crystal clear, and without qualification; the hospital MUST provide "a person in need of emergency services access to diagnosis" regardless of inability to pay. (Emphasis added.)

ERROR AS A MATTER OF FACT
Even if the jury had been properly instructed and the verdict form had been correctly worded and framed, we find that the jury erred under a manifest error-clearly wrong standard of appellate review. Stobart v. State, Through DOTD, 617 So.2d 880 (La. 1993). Nurse Braman's testimony is so internally inconsistent and so contradictory that it is unbelievable to the extent that it can be taken to deny that she knew or should have known that Deborah was asking that Cypress provide King with emergency services. Id. This is particularly so, because, as noted previously, she and others like administrator Reedy, admit that it was her, and Cypress', practice to refer those in emergency straits and without the ability to pay for services to other institutions and not to treat them as required by statute, that it was in the patient's best interest not to create a debt he would not be able to pay. She testifies regarding one of her conversations with Deborah:
A When I asked what his problem was, she talked about the drinking and that irrational behavior and that they thought he might be suicidal.

Q Did you inquire any further at that point when she told you that?
A No. I didn't because I was trying to refer her to a source where she could get some assistance.
Q You were not one of those sources presumably? You were not a source that could help him?
A I was a source but it's generally the policy to try to refer them to where they can get assistance somewhere. [Emphasis added.]
It is obvious that Cypress' policy and practice was: you do not have funds or insurance, you do not get service here. Reedy's testimony, a portion of which was previously quoted, also makes this clear, as does St. Romain's. Thus, considering the record as a whole, we find that the jury was also manifestly wrong in finding that Cypress did not violate its duty under the statute. Id.

CAUSATION
In this case, as in any negligence action, the plaintiff must prove that the defendant owed the plaintiff a duty to protect against the risk involved, that the defendant breached that duty, that the plaintiff suffered an injury, and that the defendant's actions were a substantial cause-in-fact of the injury. Smith v. State Through Dept. HHR, 523 So.2d 815 (La.1988).
For the reasons given in the previous discussion, we have found that Cypress had a duty that it breached under statute (La.R.S. 40:2113.6). Furthermore, a hospital is bound to exercise the degree of care toward a patient that his particular condition requires and to protect the patient from external circumstances peculiarly within the hospital's control; a breach of its duty must be determined under the facts and circumstances of each particular case. Id.; Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713 (La.1986).
We conclude that Cypress' duty encompassed the risk involved, King suffered *848 the ultimate injury as a result of the breach of that duty, and the defendant's breach of its duty was a substantial cause-in-fact of the injury. Requiring hospitals to provide certain services to persons in an emergency status, without regard to whether such persons can pay for those services, comports with the stated statutory purposes under La. R.S. 40:2101, as well as generally recognized public policy, which is to protect public health and safeguard human life.
A plaintiff's burden is not the unrealistic burden of proving that the decedent would have lived had he received the appropriate care and treatment; rather, it need only be shown that the defendant's conduct denied the patient a chance of survival Id.; Gordon v. Willis Knighton Medical Center, 27,044 (La.App. 2 Cir. 6/21/95), 661 So.2d 991, writ denied, 95-2776 (La. 1/26/96), 666 So.2d 679. Cypress was just the sort of specialty facility with a trained staff and accommodations to bestow particular care and treatment on a person in the emergency predicament that King Fleming was in and the one in which King obviously had confidence. Instead, because he did not have the ability to pay for that care and treatment, his emergency situation was ignored and exacerbated, and he was referred to institutions perhaps not as suited to his problem, and without having first been assessed, diagnosed, and stabilized. The statutory purpose of requiring that hospitals render such services without regard to ability to pay is to prevent exactly what happened here. This Cypress did not do, thus denying to King Fleming a chance of survival.

DAMAGES
The appellate courts of Louisiana are empowered by La.Code Civ.P. 2164 to render any judgment which is just, legal, and proper. A court of appeal may fix quantum in a suit for damages where the plaintiff's demands based on liability were rejected at trial and the court of appeal reverses that liability finding on appeal. Dundas v. Real Superstore, 94-979 (La.App. 3 Cir. 2/1/95), 650 So.2d 402; writ denied, 95-0470 (La. 4/28/95), 653 So.2d 590. The reviewing court may make an award that is just and fair for the damages revealed by the record, where the trial court, as here, has made no award for damages. Id.
The record establishes that King Fleming and his wife Deborah separated at the end of 1988, only a couple of months prior to his death. King was living in Lake Charles and Deborah in Lafayette. Despite this fact, they apparently maintained a close relationship, speaking on the phone at least twice a day and seeing each other a couple of times a week. King sometimes spent the night with Deborah in Lafayette and would leave in the morning for work. Deborah testified that the separation was an economical arrangement based on King being unable to find work in Lafayette and her needing to stay thereshe had a job with steady income in Lafayetteher daughter, who suffers from a fatal lung disease, needed to be close to her doctors, and Deborah's family, on whom she relied for emotional support, were in Lafayette.
A petition for separation had been filed by King prior to his death in February 1989, but no action had been taken on the petition. Deborah stated that King filed it out of frustration over the separation and Deborah's refusal to move to Lake Charles until the summer. She said she had originally planned to move to Lake Charles after her daughter's school was out for the summer, and King was finding the separation difficult. She further stated that she and King loved each other very much. Deborah stated she spoke with King several times on February 15, 1989, the day she met him at Cypress. She said he wanted to move back to Lafayette that day.
Wrongful death awards to surviving spouses who were separated from the decedent at the time of his death are varied. See Nigreville v. Federated Rural Electric Insurance Company, 93-1202 (La.App. 3 Cir. 7/13/94), 642 So.2d 216, writ denied, 94-2803 (La. 1/27/95), 649 So.2d 384; Miley v. Louisiana Farm Bureau Casualty Ins. Co., 599 So.2d 791 (La.App. 1 Cir.), writ denied, 604 So.2d 1313 (La.1992); Nguyen v. Pausina, 607 So.2d 675 (La.App. 4 Cir.1992); Brown v. State, Through DOTD, 572 So.2d 1058 (La.App. 5 Cir.1990), writ denied, 581 *849 So.2d 710 (La.1991). In light of the close relationship Deborah and King maintained during their separation and her expectation of the continuation of that relationship, we award Deborah Fleming $100,000 for the wrongful death of her husband.
Likewise, Fleming's adult daughters testified that they had had an ongoing, close relationship with their father prior to his death. Saundra, who lives in Chicago, and Sharon, who lives in Houston, both stated they talked to their father every month or so on the phone and exchanged cards with him. Sharon stated she saw her father about four or five times a year. Saundra said she had seen him about once a year for the past few years. General damage awards to major children are traditionally lower than awards given to minor children. Thomas v. State Farm Insurance Co., 499 So.2d 562, 566 (La. App. 2 Cir.1986), writ denied, 501 So.2d 213, 215 (La.1987). We award Sharon and Saundra $40,000 each for the wrongful death of their father.
Deborah Fleming has also brought a survival action. While there is no evidence that King experienced any physical suffering prior to his death, he did endure mental pain and suffering. From the time King was refused medical treatment by Cypress on the night of February 15, until he died after 1:00 am. the next morning, he was severely depressed and experienced acute suicidal anxiety. Deborah Fleming and Ellis Guilbeau both testified to King's extreme agitation, his inability to stay still, his repeated pleas for help and his paranoia. We can only imagine his suffering lying on the interstate faced with oncoming traffic. We award King's estate $25,000 for the pain and suffering he experienced after Cypress refused to treat him until his death.

CONCLUSION
For the reasons stated in this opinion, the findings and rulings of the trial court are reversed. We assess damages as follows: Deborah Fleming, $100,000; each daughter, $40,000; King Fleming's estate, $25,000.
Costs of these proceedings are assessed to the defendant.
REVERSED AND REMANDED WITH INSTRUCTIONS.
KNOLL, J., dissents and assigns reasons.
AMY, J., dissents for the reasons assigned by KNOLL, J.
KNOLL, Judge, dissenting.
First, I disagree with the majority's determination that the jury interrogatory used was an error of law. The majority opinion states that the relevant statute, La.R.S. 40:2113.6, requiring hospitals to provide emergency services, does not require a determination of "fault." While it is true that the statute does not mention "fault," the statute does not provide for civil recovery for its violation.
La.R.S. 40:2113.6 provides a statutory duty to supply emergency medical services regardless of the patient's ability to pay. There must be a breach of that statutory duty which causes damages to allow recovery. This breach of duty is fairly characterized in laymen's terms as "fault." Whether Cypress Hospital had the statutory duty and whether it breached that duty were questions fairly presented to the jury by the interrogatory.
I also disagree with the majority's determination that the jury was confused by a jury instruction that allowed considerations of reasonableness and discretion. The opinion states that the mandatory nature of the statute does not allow for determinations of reasonableness. I disagree. The statute, by its very terms provides that "emergency services" are services that "if not stabilized, could reasonably be expected to result in the loss of the person's life ..."
To invoke the statutory duty of La.R.S. 40:2113.6, one must be in need of "emergency services." Whether King needed emergency services was a serious issue before the jury: was King's condition one that could reasonably be expected to result in the loss of the person's life? In retrospect, the answer is obvious. Nevertheless, the record reflects that King was not clearly suicidal when he arrived in the Cypress parking lot.
*850 Deborah's testimony that she told Nurse Braman that King was suicidal was refuted by Nurse Braman. Mr. Ellis Guillbeau, who had recently spent more time than anyone with King, testified that he did not think that King was suicidal. Mr. Guillbeau even let King ride in the bed of his pickup as they drove down the interstate from Lake Charles to Lafayette. I also find the fact that King was able to make the trip to Lafayette, when he could have secured care in Lake Charles relevant to the determination that there was no emergency. Furthermore, he was taken to UMC in the care of his estranged wife and his friend, and he did in fact arrive safely at UMC which was only minutes away from Cypress. Contrast Tabor v. Doctors Memorial Hospital, 563 So.2d 233 (La.1990), where a young man was brought to the emergency room after having consumed 10-13 Quaaludes in a suicide attempt. In the case sub judice, there are only vague references that King was "suicidal." There were simply no objective indications that King's life was in immediate danger. The jury obviously made a credibility determination which should not be disturbed.
I do not find that the interrogatory and the jury instruction were so incorrect that the jury was precluded from reaching a verdict based on the law and facts. To the contrary, I find that the jury was properly instructed, based on the relevant jurisprudence, notably the Tabor series of cases. Most importantly, the glaring fact is that King never entered Cypress, and it was King's estranged wife, Deborah, that told King to go to UMC, not Cypress. A duty by Cypress to King never developed.
I also disagree with the majority's finding that the jury was manifestly erroneous in finding Cypress free from fault. The jury was completely justified by the record in finding that the hospital did not breach its duty to King. In reversing the jury's findings, the majority disregards the reasonable credibility determination made by the jury in favor of Nurse Braman. I find that these sorts of credibility determinations are squarely within the province of the trier of fact, and should be overturned for compelling reasons only, and only on rare occasions, which are not present in this case.
Finally, I find that the majority opinion overlooks the policy behind La.R.S. 40:2113.6. The statute was enacted to allow patients to seek quick medical care in emergency situations until their condition could be stabilized. It was not enacted to allow persons a choice of any hospital they desire. King decided he wanted private care, not that he needed emergency care. There is no other reason why he decided to undertake a trip to Lafayette when he could have been treated in Lake Charles, where he lived. This is not the case in which an early labor causes a pregnant mother to seek refuge at the nearest possible hospital. Nor is this the case of an accident victim being brought to the nearest medical facility. This is a case where plaintiff, who had enough time to choose between numerous hospitals, and who was in no immediate danger of dying, desired private care at the hospital of his choice rather than the treatment provided by a public facility.
For the foregoing reasons, I respectfully dissent.